FELDMAN *v.* WEAR-U-WELL SHOE CO.

1. CONTRACT — COMMISSION AGENCY — PRINCIPAL AND AGENT — BREACH—DIRECTING VERDICT.

Where plaintiff entered into a contract to sell shoes for the defendant at a place named, on commission, and the former was required by the field agent who negotiated the contract to change the front of his shop or store to suit the business, and the work of the field agent was locating agencies which he had authority to establish on such terms as were called for by such agency contracts, and where

there was a conflict of the evidence relating to the ground for canceling the contract on defendant's part, the trial court did not err in submitting the issues to the jury whether defendant had committed a breach of the contract, and whether the defendant was bound by such oral arrangements made by its field agent as to the changes in the store, and expense to which plaintiff was put in preparing to sell its merchandise.

2. SAME—DAMAGES—BREACH OF AGENCY CONTRACT.

Whether or not the agent had authority to embody such arrangements in the contract, defendant was liable for such damages as were within the mutual contemplation of the parties.

3. SAME—VERDICT—NEW TRIAL.

And under the testimony, *held*, that a verdict for damages of $437.85 for selling plaintiff's old stock, and alterations made in the front of his store, and other expenses of preparing to act as defendant's retail agent, was not so excessive as to require the granting of a new trial.

Error to Presque Isle; Emerick, J. Submitted January 12, 1916. (Docket No. 20.) Decided March 30, 1916. Rehearing denied June 23, 1916.

Assumpsit by Sam Feldman against the Wear-U-Well Shoe Company, a foreign corporation, for damages for breach of contract. Judgment for plaintiff. Defendant brings error. Affirmed.

STONE, C. J. This is a suit in assumpsit to recover damages for an alleged breach of a contract appointing plaintiff defendant's sales agent at Onaway, Mich. The damages claimed were for expenses incurred by plaintiff in altering his store to receive the defendant's goods, for loss sustained in having to sell his old stock on hand to make room for the new stock, and for labor and expenses incurred in securing certain lists of names and copying the same for the defendant.

The defendant and appellant is an Ohio corporation authorized to do business in Michigan. Its business

consisted of selling direct to the customer, at retail, boots and shoes manufactured by it at Columbus, Ohio. It did this by establishing stores in various towns and cities, each store in charge of a local agent. A general agent, one A. W. Prindle, had charge of certain territory and the stores in it. His duties and powers, as testified to by him, will be hereinafter stated. The contracts were made on printed blanks furnished by the defendant.

Some time prior to December 28, 1912, the plaintiff, who had a small store and shoe shop at Onaway, wrote to Mr. Prindle, defendant's said agent in control of the territory in which Onaway was situated, requesting to be appointed local agent at that place. On said December 28th Mr. Prindle was at Onaway, and he, in behalf of the defendant, and the plaintiff, signed the following contract:

"Articles of Agreement entered into this 28th day of December, 1912, by and between the Wear-U-Well Shoe Company, hereinafter described as party of the first part, and Sam Feldman, hereinafter described as party of the second part, witnesseth:

"(1) Party of the first part will hereby designate and create the party of the second part as its sales agent at Onaway, State of Michigan, to sell and dispose of the goods hereinafter described, consigned to him, party of the second part, as such sales agent, and subject to the terms hereinafter set forth.

"(2) The goods herein contemplated to be consigned to the party of the second part by party of the first part to consist of shoes and rubber goods, findings and fixtures, furnished by party of the first part and invoiced by it, the amount of such consignment to be at all times at the option of the party of the first part. The party of the first part will also furnish said second party certain advertising matter, printed and otherwise, consisting of circulars, papers, bills and other forms of advertising which the first party may select at its option. It also will furnish to said second party certain interior and exterior decorations for use at the salesroom where said goods will be stored. As said

stock is from time to time depleted ,by sales made therefrom, it is to be replenished and added to from time to time at the option of the first party in such amount and of such quality as the first party may determine.

"(3) Party of the second part is to keep said stock in good and merchantable condition and is to be responsible to the party of the first part for any loss or damage resulting to said goods, or a part thereof, from any other cause than that of accidental fire.

"(4) Party of the first part is to keep said stock insured in its name and to pay the insurance payments thereon.

"(5) The second party is to furnish room for said merchandise, and all transportation, operating, and maintenance expense and charges shall be borne by the party of the second part, including all taxes and assessments which may be levied thereon, either through or by virtue of State law or any municipal ordinance or regulation.

"(6) The second party further agrees to be responsible to the first party for all moneys received from the sale of said goods until the same has been deposited in a bank to be selected by said first party, and a banker's certificate given for each separate deposit. Proceeds of such sales to be the property of the party of the first part, and the deposit of the same to be according to such method and reported to said party of the first part upon blanks and forms prepared by it.

"(7) The second party agrees at all times to follow the instructions and use the accounting systems provided by party of the first part.

"(8) The party of the second part further agrees to deliver and surrender said stock of goods and each part thereof at any. time after having received fifteen days' notice to do so from the party of the first part. Second party further agrees to execute and deliver to the first party a bond in such amount and upon such condition for the performance of this contract, upon his part to be performed as may be required by said first party.

"(9) In consideration of the employment of said second party by said first party, said second party further agrees not to sell or deal in any other shoes

than those obtained from the first party during the term of this contract, and in case of violation of this part of this agreement by said second party he agrees to forfeit and pay to the said first party the sum of $500 as liquidated damages therefor. The second party further agrees that in the event this contract be terminated for any reason the second party will not engage in or be employed by or in any way connected with the business of selling shoes at either wholesale or retail, within said county of Presque Isle, State of Michigan, for the period of six months next succeeding the termination of this contract.

"(10) For and in consideration of the services of said party of the second part, and agreements on his part to be observed and maintained, the first party agrees to pay to the second party a compensation as follows: The same to be computed upon a percentage basis, being 12 per cent. of all the sales of shoes sold at $2.98 per pair or higher, and 12 per cent on all shoes sold at $2.48 per pair or lower. The computation and payments of such compensation to be made therefor monthly, and the amount thereof to be paid by the first party to said second party, but second party has no right to deduct the amount thereof from the amount of sales, which at all times are to be deposited to the credit of the first party in full amount as sold.

"(11) The said second party further agrees to sell all goods included in this agreement for cash. Should he extend credit to any one, he agrees to pay cash to party of the first part out of his own funds at the time of sale.

"In witness whereof party of the first part, in its proper officers, have hereunto set its hand and seal, and the party of the second part has set his hand on the day and year first above mentioned.

"THE WEAR-U-WELL SHOE CO.,
"A. W. PRINDLE.
"SAM FELDMAN.
"Witnessed by A. W. Prindle.
"The location of the above is Main street."

It was claimed by plaintiff that on the day the contract was signed he and Mr. Prindle visited a local

agent of the Massachusetts Bonding & Insurance Company with a view of giving the bond required by the contract; that after some conversation with the bonding company's agent Mr. Prindle said to plaintiff that defendant would get a bond from the same company for the plaintiff for $5 a year, and said to plaintiff:

"You will get a letter from the bonding company inside of a week or a few days. When you get the letter from the bonding company, send your check for $5 and sign with a witness, and then your bond will be accepted."

In a letter dated January 8, 1913, the general agent of the bonding company sent to the plaintiff the bond to sign, and he did sign it, and sent it with his check for $5 to the Massachusetts Bonding & Insurance Company at Columbus, Ohio. The bonding company received the plaintiff's check and cashed it, and the paid check was produced upon the trial. It was dated January 11, 1913, and on January 15, 1913, the defendant wrote to the plaintiff as follows:

"We wish to acknowledge receipt of contract for opening a branch in your city. We will ship the goods as soon as we possibly can, and wish you would please notify us when they come to hand. We will then advise you the day of opening."

The defendant never shipped plaintiff any goods, and he heard nothing more about the matter until he received a letter from Mr. Prindle, dated February 24, 1913, in which he said:

"I inclose you a bond to get some one who is responsible for $1,000 free from exemption to sign and return to me at Bay City so I can look it over; then we can open you up."

On March 12, 1913, Mr. Prindle went to Onaway, and while he was there called upon the plaintiff, and according to plaintiff's testimony the following conversation occurred:

Mr. Prindle said to plaintiff:

"I want you to get personal bonds, and I will give you the shoes."

The plaintiff replied:

"I give you one bond, and ain't got my check back, and I couldn't give you twice bond."

On direct examination the plaintiff testified:

"Q. Did you tell him that you would not—you would give him a personal bond?

"A. Yes, sir.

"Q. If that was straightened out?

"A. Yes, sir.

"Q. And had the company notified you before that time your bond had been canceled?

"A. No, sir."

On cross-examination the plaintiff testified:

"I told Mr. Prindle if I will get my check back again I will give him a personal bond."

This was the second trial of the case. Upon the former trial Mr. Prindle had testified. He died before the trial we are dealing with, and his testimony taken upon the former trial was read by the court and the official stenographer. Upon this subject Mr. Prindle's testimony was as follows, on direct examination:

"It was after February 25th when I met Mr. Feldman in his store and asked him for a new bond. He said he wouldn't give it to me; he has given one, and that was all he was going to give."

It is undisputed that after the conversation between Mr. Prindle and the plaintiff on that occasion, and while Mr. Prindle was at Onaway, he entered into a contract with W. H. Fish to become the defendant's agent at Onaway, under date of March 12, 1913, to put in a stock of shoes for Mr. Fish and appointed him manager of the defendant's company at Onaway. It is the claim of the plaintiff that he was not informed

at any time that the bonding company had refused to accept his original bond until he received a letter dated March 14, 1913, from the defendant, in which the defendant said:

"The Massachusetts Bonding Company for some reason refuse to accept the bond for which you made application, and we have written Mr. Prindle to call and see you and arrange for personal bond."

It will be observed that before this letter was written Mr. Prindle had given the agency to Mr. Fish. The plaintiff further testified that afterwards he received a letter from the bonding company bearing date April 2, 1913, in which the company said:

"Inclosed find check for $3.90, the same being for the unearned premium on your bond in favor of the Wear-U-Well Shoe Company, the earned premium on the same from the time the bond was issued to date of cancellation being $1.10."

A material question in the case is as to the duties and powers of the defendant's agent, Mr. Prindle. Upon that subject his testimony upon the first trial, in February, 1914, as read into the record in the instant case, was as follows: After referring to his retirement as district manager for the defendant on account of ill health in January of that year, he said:

"Before that I had been in their employ ever since they started business. My territory was the southern peninsula. My business with them was the contracting with people for running stores, to audit stock and see if it was all there, and to keep them in shape, and to do a general business."

On cross-examination he testified as follows:

"I was with the Wear-U-Well Shoe Company ever since they were organized, and before that for ten years. They organized the company four years ago the 27th of May. I was with the company before that for ten years. The Wear-U-Well Shoe Company is a

corporation with its headquarters at Columbus, Ohio. Their general business is manufacturing shoes and selling them at retail direct to customers. Their method of doing that was appointing agents and having agents for their distributors in the local places. Onaway was one of them. There were 100 of these stores in the State the last I heard. There is more than that now. I had to look after 47, outside of the two south tiers of counties of Michigan. I had all the rest of the southern peninsula. My business was the managing stores, contracting with people and checking them up to see if they had the goods, and doing the general business that was to be done. I looked after all the business in Michigan in the territory I described. I had a written contract to do that work. The contract did not state exactly all the authority I had, but part of it anyway. I haven't the contract with me. It is in existence. There is one at my house in Pinconning, and one down at the headquarters at Columbus. They have the original, and I have a copy. I haven't it with me. I made contracts around through Michigan with the distributors or local managers, and, when I sent the company the contract and bond for the stock, they sent it.

"*Q.* Now, you made contracts with individuals with whom you could put in a stock according to the circumstances, did you not, in the different places?

"*A.* Well, I sent out about the same kind of stock to every town.

"*Q.* Yes; but in making the arrangements you had the authority to make arrangements to put in these stocks and handle them, didn't you?

"*A.* I could make a contract with whoever I wanted to.

"*Q.* You signed the contract for the company, didn't you?

"*A.* I signed the contract for the company, but I couldn't contract for anything that wasn't on the contract.

"*Q.* What is that?

"*A.* I couldn't obligate them to anything only what was on the contract.

"*Q.* If it became necessary to arrange, make advance

191 Mich.—6.

arrangements to put in a stock, you had the authority to do that, didn't you?

"*A.* Not unless they would accept it.

"*Q.* What is that?

"*A.* Not unless they would accept it, if it was outside the contract.

"*Q.* In making the contract, and afterwards, you had authority to make the arrangements, didn't you, in order to get the stock in?

"*A.* Give me that over again.

(Last question read by stenographer.)

"*A.* I had authority to make all the arrangements the contract would call for.

"*Q.* Yes; you had authority to may any arrangements to get in the stock and get a place for the stock?

"*A.* No; I didn't have all that authority, because, if I had to put a stock out to get a stock in, I wouldn't had no authority to have done that.

"*Q.* No; I didn't mean that at all. In many places it was necessary for you to make arrangements to clear out the store and get ready for it?

"*A.* That was the local man's business to do that.

"*Q.* You were the only one who had any authority to make any change at all, wasn't you, in Michigan?

"*A.* I had the authority to put in the stocks. The local man had to make the arrangements for the stock.

"*Q.* You made no preliminary arrangements you say?

"*A.* No, sir; I had nothing to do with making arrangements for putting in a stock; that was the local man's business. If he wanted my stock and made arrangements for it, why, he got the stock; if he didn't, why, he didn't get it."

Upon the trial, against the objection and exception of defendant's counsel, the plaintiff testified that in his arrangement with Mr. Prindle he was told that he must change his storeroom in the front by taking out the window and putting in plate glass, and by taking out the partition and papering the store and painting it. He further testified:

"Then I says to Mr. Prindle, I couldn't afford to put in that expense in the store; I wouldn't sign the

contract; and he said: 'When we will send you the shoes you give us the first Saturday night commission, and we will pay all the expenses what it will cost.' "

He further testified that in his arrangement with Mr. Prindle the latter told him that he must sell out the rubbers and shoes and stock on hand before the Wear-U-Well Company's stock came on; and it was agreed that he was to close out and get the stock he had in there out before the shoes came, which would be in about two weeks. It is the further claim of the plaintiff, and testified to by him, that following the agreement and understanding that the plaintiff had with defendant's manager in reference to fixing over the store and the selling out of the stock, and the procuring of the list of names for the defendant, he also had to get ready to take in the stock of the defendant; that he sent for the plate glass, took out the partition, papered the store, moved his shoeshop into the back room, and got the store and everything ready in the manner he was directed to do; that the repairs necessitated the expenditure of $75; that in the sale of the stock which he had on hand, and which he was required to dispose of, as under the contract he could sell no other goods of the character furnished by the defendant during the time of the contract, he was obliged to sell at a sacrifice, and he lost on the stock $300 by having to close it out in so short a time.

The case was submitted to the jury in a very full charge, in which the court called attention: *First,* to the question of the conflict between the testimony of the plaintiff and Mr. Prindle relative to the bond; and, *second,* upon the subject of damages. The trial resulted in a verdict and judgment for the plaintiff in the sum of $437.85.

It is claimed by the defendant, and it seems probable from the evidence in the case, and from the charge of the court, that there were embraced in the verdict

the loss on the old stock sold, $300; repairs to building, $75; for names obtained, $42—making a total of $417; interest on this sum for one year at 5 per cent., as directed by the court in case a verdict was found for the plaintiff, $20.85—making the total of the verdict. There was a motion for a new trial, which was denied, and exception duly taken, and the case has been brought here by the defendant for review.

The numerous assignments of error of the defendant are discussed by its counsel under four heads:

(1) That the defendant was not in fault in canceling the contract and appointing another agent.

(2) Defendant was not chargeable with any arrangement that its agent, Mr. Prindle, might make with the plaintiff that was not embodied in the written contract submitted to, and approved by it.

(3) If defendant were in fault in canceling the contract, it was not such fault as to subject it to damages.

(4) If the defendant's action canceling the contract subjects it to damages, what should be the measure of those damages?

1. Whether the defendant was in fault in canceling the contract and appointing another agent depends upon whether it wrongfully canceled the contract, and whether the jury believed the testimony of the plaintiff or that of the defendant's agent relating to the proposed new bond. That question was fairly and fully submitted to the jury by the trial court in a very elaborate charge. We think it presented purely a question of fact, and, the jury having found in favor of the plaintiff, we see no reason for disturbing the verdict or judgment upon that ground.

2. We have set forth the testimony of Mr. Prindle covering the questions of his duty and authority as general agent for the defendant. We might dispose of this branch of the case by saying that such testimony presented a question of fact for the jury. Whatever may be said of the authority of Mr. Prindle to

go outside the contract in matters not covered by that instrument, it is very apparent that, if the defendant wrongfully canceled the contract and deprived the plaintiff of the benefit of it, the defendant must have known by its acquaintance with the nature of the business to be engaged in that the plaintiff would necessarily suffer considerable damage as a natural result of that cancellation. Certain damages would naturally spring from a breach of the contract. For instance, the defendant must have known that, if the plaintiff was proceeding in accordance with the terms of the contract, he was making the necessary arrangements to receive the defendant's goods, to make room for them in his store, and to place the same on sale under advantageous conditions, and, if deprived of that right, that damages would naturally follow.

3. The third and fourth propositions of the defendant may well be considered together. What we have already said upon the subject of damages applies here. The damages should be such as would reasonably compensate the plaintiff for the injury which he had suffered.

"In cases of breach of contract the damages 'should be such as may fairly and reasonably be considered either arising naturally, *i. e.,* according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract, as the probable result of the breach of it.' " *Hopkins* v. *Sanford,* 38 Mich. 611, 613.

See, also, *Tracy* v. *Butters,* 40 Mich. 406, citing *Allison* v. *Chandler,* 11 Mich. 542; *Drysdall* v. *Smith,* 44 Mich. 119 (6 N. W. 211); *Murdock* v. *Roe,* 186 Mich. 233 (152 N. W. 969).

We have examined the charge with great care upon this branch of the case, and are of opinion that the question was properly submitted, and that the dam-

ages recovered were neither unreasonable nor excessive.

After a careful examination of the entire case, we cannot say that any of the alleged errors have resulted in a miscarriage of justice.

The judgment of the court below is therefore affirmed.

KUHN, OSTRANDER, BIRD, MOORE, STEERE, BROOKE, and PERSON, JJ., concurred.