EARL DUBEY & SONS, INC. v MACOMB CONCRETE
CORPORATION

1. APPEAL AND ERROR—DIRECTED VERDICT—EVIDENCE—JURY QUES-
TION—JUDGMENT—JUDGMENT NOTWITHSTANDING VERDICT—
FACTS AND INFERENCES.

The Court of Appeals must view evidence in a light most favora-
ble to the plaintiff when reviewing a denial of a directed
verdict and if, in doing so, the Court determines that there is
any evidence which was competent and sufficient to support the
jury's determination, the jury's resolution of the case should be
affirmed; a motion for judgment notwithstanding the verdict is
reviewed even more strictly, since the facts are viewed inferen-
tially in favor of the non-moving party.

2. CONTRACTS—SIGNATURES—MULTIPLE PARTIES—BURDEN OF PROOF—
INTENTION—EVIDENCE—QUESTION OF FACT.

A contract signatory who claims that the contract is void because
all of the intended parties did not sign has the burden of
proving that it was the intent of all the parties that none
should be bound unless all signed; intention governs, and
whether the signers of a contract intended to be bound by its
terms even though less than all the named persons sign is a
question of fact to be decided upon the evidence.

3. APPEAL AND ERROR—DIRECTED VERDICT—CONTRACTS—EVIDENCE—
JUDGMENT—JUDGMENT NOTWITHSTANDING VERDICT—FACTS AND
INFERENCES.

The denial of a defendant's motion for judgment notwithstanding
the verdict is not error where the facts, viewed inferentially,
are in the plaintiff's favor.

4. CONTRACTS—CONSIDERATION—WILL OF PROMISOR—UNENFORCEABLE
PROVISIONS.

A promise to advance money which is dependent on the will of
the promisor is unenforceable.

REFERENCES FOR POINTS IN HEADNOTES

[1, 3] 75 Am Jur 2d, Trial § 474.
[2] 17 Am Jur 2d, Contracts §§ 18–22, 245.
[4] 17 Am Jur 2d, Contracts §§ 10–13.
[5, 6] 17 Am Jur 2d, Contracts §§ 230, 231.
[7] 22 Am Jur 2d, Damages § 161.

5. CONTRACTS—ENFORCEABLE PROMISES—UNENFORCEABLE PROMISES—
   INDEFINITENESS—ENFORCEMENT OF VALID PROMISES.

   Unenforceable promises in a contract will not vitiate the entire
   contract where there are promises that are enforceable; if
   portions of a contract are unenforceable by the terms of the
   agreement, it will not affect the enforceability of other portions
   of the contract that are valid.

6. CONTRACTS—CONSIDERATION—ENFORCEABLE AND UNENFORCEABLE
   PROVISIONS.

   Adequate consideration in exchange for an enforceable promise
   in a contract having both enforceable and unenforceable provi-
   sions makes the enforceable portion of the contract binding on
   both sides.

7. DAMAGES—CONTRACTS—PREVENTION OF PERFORMANCE—LOSS OF
   PROFITS—SPECULATIVE DAMAGES—ACTUAL EXPENDITURES—
   VALUE OF SERVICES—RELIANCE DAMAGES.

   Generally, the measure of damages from the prevention of per-
   formance of a contract would be the loss of profits to the
   plaintiff, but where the profits are wholly speculative and
   unprovable, the one who prevents performance should not go
   scot-free because the claimant should at least be made whole
   for his losses and expenditures; where profits are speculative,
   the measure of damages is the actual expenditures and value of
   services reasonably spent in an attempt to perform the contract
   or in reliance upon it; therefore, a plaintiff may properly seek
   reliance damages based on the reasonable expenses incurred in
   attempting to perform the contract.

Appeal from Macomb, Robert J. Chrzanowski, J.
Submitted January 5, 1978, at Lansing. (Docket
No. 77-216.) Decided March 7, 1978. Leave to
appeal applied for.

Complaint by Earl Dubey & Sons, Inc., against
Macomb Concrete Corporation for rescission of and
seeking damages for fraud, misrepresentation and
breach of contract. Sentry Insurance, Dubey's
surety, was added as a party plaintiff by stipula-
tion of the parties. Counter-complaint by Macomb
Concrete against Dubey and Sentry seeking dam-
ages for breach of contract. Judgment for plaintiff

Dubey. Defendant appeals by leave granted. Affirmed.

*Freihofer, Oosterhouse, DeBoer, Barnhart & Cooper, P. C.* (by *Peter R. Tolley*), for plaintiff.

*Robert P. Dank, P. C.,* for defendant.

Before: V. J. BRENNAN, P. J., and D. E. HOLBROOK and R. B. MARTIN,* JJ.

D. E. HOLBROOK, J. Plaintiff, Earl Dubey and Sons, Inc., commenced this action for rescission of an agreement as the result of the anticipatory breach by defendant, Macomb Concrete Corporation, and for damages in excess of $300,000. Plaintiff, Sentry Insurance, sought discharge of its liability on a performance bond. Defendant Macomb counter-claimed that plaintiffs were in default under the agreement and Macomb sought damages for fulfilling the contract by other means. Following a five-week trial, plaintiffs' equitable claims were taken from the jury and resolved adversely to plaintiffs by the trial judge. These theories were fraud, misrepresentation, mutual mistake and economic impossibility of performance. However, the trial court ruled that the breach of contract claim should be submitted to the jury. On April 26, 1976, the jury returned a verdict in plaintiff Dubey's favor for $313,661.56. Defendant's motion for judgment notwithstanding the verdict was denied on September 13, 1976. Thereafter, defendant claimed an appeal as of right to this Court, but on motion of plaintiffs, the claim was dismissed as not timely filed. Defendant then made application for delayed appeal and on June 1, 1977, this Court granted leave.

---

* Circuit judge, sitting on the Court of Appeals by assignment.

To have a proper understanding of this case, a complete recitation of the facts is necessary.

Plaintiff Earl Dubey and Sons, Inc. is a Michigan corporation located in Alpena, Michigan, and primarily engaged in the business of excavating, gravel crushing and sand and gravel production.

Defendant Macomb Concrete Corporation, now known as Macomb Contracting Corporation, is a Michigan corporation located in Fraser, Michigan, and is primarily engaged in highway and airport runway construction.

Plaintiff Sentry Insurance was Dubey's surety on certain performance bonds concerning a sand and gravel production contract between Dubey and Macomb.

In 1973, the City of Houston, Texas, decided to resurface runways 14 and 32 of the Houston Intercontinental Airport. Macomb Concrete was one of four bidders for the contract, and was awarded that contract by resolution of the city commission on November 13, 1973. Macomb's bid of $10,057,-607 was $2,000,000 less than the next lowest bidder.

In order to construct the concrete overlays for the runways and associated taxiways at the airport, Macomb was required under the city contract to locate and have available 243,000 tons of aggregate materials which were comprised of 100,000 tons of coarse aggregate (gravel) and 143,000 tons of fine aggregate (sand). The City of Houston's contract carefully specified both the quality and size of the sand and gravel aggregates which could be used for the making of the concrete. It was the various sizes of the fine aggregate (sand) which eventually led to this entire protracted litigation. According to these specifications, with respect to the sand aggregate, out of a 100 per cent sample, a

certain percentage had to fall within a certain size category. There were eight such size categories. Specifications were set out as follows:

| Sieve Designation (Square Openings) | Percentage by Weight Passing Sieves |
| --- | --- |
| 3/8 inch | 100 |
| No. 4 | 95–100 |
| No. 8 | 65–80 |
| No. 16 | 45–60 |
| No. 30 | 30–45 |
| No. 50 | 15–30 |
| No. 100 | 5–10 |
| No. 200 | 0–2 |

The specifications also specifically proscribed against acquiring the sand aggregates from an area in Texas known as the San Jacinto River Basin which is located in close proximity to the City of Houston. This is an area known geologically to contain aggregates much too fine in size to meet the city's contract specifications. Despite this specific proscription, Macomb selected a site near Houston called the Cle-Tex pit from which it planned to get its sand and gravel. *This pit was located in the San Jacinto River Basin.* Dubey testified that he saw the language in the contract, "local fine, dirty, unsound fine sand (called field sand) as produced from the San Jacinto River or the Montgomery Formation is not permissible" but that William Buck, the vice-president of Macomb Contracting, said that the materials from the Cle-Tex pit could be used and would pass for the qualities required by the City of Houston. Macomb contracted with an engineering firm known as Murillo Testing Company to do an analysis of the Cle-Tex pit. The conclusion of the firm was that the sand and gravel met all the requirements of the specifications except for gradation, but this condition

could be remedied by careful quality control during production. The sieve analysis as to the gradation of the sand by the engineering firm indicates that the sand was too fine to meet contract specifications.

| Sieve Size | Percent Passing | City Specifications |
|---|---|---|
| 3/8 | 100 | 100 |
| No. 4 | 98 | 95–100 |
| No. 8 | 93 | 65–80 |
| No. 16 | 87 | 45–60 |
| No. 30 | 75 | 30–45 |
| No. 50 | 37 | 15–30 |
| No. 100 | 4 | 5–10 |
| No. 200 | – | 0–2 |

Macomb contacted Dubey and negotiated a contract with Dubey to produce the sand and gravel out of the Cle-Tex pit, which then would be delivered to Macomb in Houston to make the concrete for the airport runways. This contract was executed on January 31, 1974, and required Dubey to produce the required tonnage of coarse and fine aggregates (sand) from the Cle-Tex pit for the contracted price of $543,000. Macomb required of Dubey that it supply performance bonds in such an amount, and such bonds were in fact provided by Sentry Insurance. Dubey was to produce the sand and gravel materials within 180 days or by June 3, 1974.

The contract was signed by Macomb and Dubey after extensive negotiations, including at least four preliminary drafts each containing various modifications. Prior to the execution of the contract, Macomb had advanced $20,000 to Dubey towards expenses of design and shipment of plant equipment. The contract called for further advances of $43,000 upon signing, and an additional $100,000

for plant and site preparation which was paid by Macomb before production was attempted.

Dubey took possession of the Cle-Tex site in February of 1974, and had no difficulty in producing the gravel requirements under its contract with Macomb, but soon discovered the deficiency of the sand deposits and the fact that specification sand could not be made from the Cle-Tex pit. Despite the introduction of special equipment and the development of new and novel mining devices, no specification sand could be produced without wasting up to 60 per cent of the materials being mined at Cle-Tex.

By May of 1974, no specification sand had been produced, although Dubey was producing specification gravel. Macomb then hired a specialist by the name of Finis White who was to work and consult with Dubey in an effort to produce the specification sand. It is not contested that Mr. White was considered to be the foremost authority in the southwest, if not the country, on sand and gravel production. Like Dubey, he failed to find a way to produce specification sand from the Cle-Tex pit without "blending"; that is, by mixing Cle-Tex aggregates with materials brought in from another site.

By the end of May 1974, and although Dubey had been on the production site for approximately three months, no specification sand could be produced. On May 28, 1974, Dubey and Macomb amended the original contract. This agreement acknowledged difficulties in producing the sand from the Cle-Tex pit, and provided for an extension of time within which Dubey was to complete performance, and also provided that Macomb was to advance against Dubey's original contract price

certain payments to creditors. The contract provided that Dubey was to be able to substantially perform within 14 days at the rate of 2,000 tons a day and if it could not produce 20,000 tons between the 14th and 24th day, he was to quit the premises. Macomb advanced $25,000 jointly payable to Dubey and his creditors and also agreed to advance $33,000 to Westinghouse Credit Corporation, the lienholder on Dubey's plant.

The parties operated under the May 28 agreement until the end of June 1974, and at that time no economical way could be found to produce specification sand. Dubey left Texas and returned to Michigan in an attempt to negotiate a further extension of time and still more advances on the contract. In Michigan, Dubey was told by Jim Hicks, Macomb's executive vice-president, that Macomb would not advance Dubey any further funds.

On July 12, 1974, a meeting was held at the offices of Bracewell and Patterson, Macomb's Texas counsel. Present at the meeting were Wayne Dubey; counsel for Dubey; Orville Loos, the president of the lessor, Cle-Tex; counsel for Cle-Tex; a representative from Sentry Insurance, Dubey's bonding company; a representative of Westinghouse Credit and representatives of Macomb. At this meeting, Cle-Tex accused Macomb of being in breach of its lease through the actions of Dubey in allowing a labor and materials lien to attach to the leased pit and threatened to evict Macomb from the leased pit. Discussions occurred about further advances of funds to Dubey and a further extension of time, but no agreement was reached. A further meeting was held sometime between July 12 and July 17. Present were the same parties with the exception of Dubey's counsel. Cle-Tex again alleged a breach of Macomb's lease which

created a default and alleged a breach of a June 1 equipment lease by Dubey.

The parties entered into the last amendatory agreement, this one dated July 17, 1974. By this agreement Macomb agreed to further extend time for Dubey's performance and to pay certain of Dubey's creditors as an advance towards his original contract price. These payments to Dubey's creditors were made optional and discretionary with Macomb. In exchange for this, Dubey agreed to perform phase one of the original contract by blending sand from the Cle-Tex pit with a coarser sand found approximately 150 miles north of Houston so as to make specification materials. Phase one would have required about 20,000 tons of specification sand. Dubey agreed to pay the cost of this blend material, although the original contract provided that Dubey was to mine, wash and stockpile materials, and Macomb was to pay the cost of raw materials. Dubey also agreed to pay the expense of the consultant, Finis White, an expense which was originally that of Macomb.

Earl Dubey and Sons also agreed to provide Macomb with a promissory note payable to Macomb in the amount of the original contract price of $543,000 or so much thereof as Macomb had advanced, a security agreement giving to Macomb as collateral for the promissory note all of Dubey's equipment in Texas and a personal guarantee executed by Dubey's principal, Wayne Dubey, personally guaranteeing the promissory note of July 17.

In addition to Dubey and Macomb, Cle-Tex, Inc., the owner of the Cle-Tex sand pit, and Sentry Insurance were to be parties to this agreement. Dubey and Macomb executed and delivered all of the agreements on July 17 without requiring Sen-

try or Cle-Tex to execute those documents. Sentry's agent, at the meeting which culminated in the agreement of the 17th, gave approval to the agreements but wanted the home office to execute the documents. They were never signed by Sentry. Cle-Tex also refused to sign the contract.

Pursuant to the terms of the security agreement of July 17, on July 22, 1974, Macomb effectuated the recordation of a UCC financing statement making claim to a security interest in all of Dubey's assets. On July 24, pursuant to those agreements, Macomb paid one of Dubey's creditors, Cle-Tex, in the amount of $10,591.55.

In reliance on the agreements, Dubey began tooling up his operation and ordered the blend materials which were to be mixed with the sand at the Cle-Tex site. On July 29, 1974, Macomb, through its attorney in Houston, announced by telegram that Dubey was in default, that Macomb was taking possession of the production site and that demand was being made for payment by Dubey of the promissory note and personal guarantee of July 17, 1974. Dubey's plant was closed and the relationship between Dubey and Macomb was ended.

On September 13, 1974, Dubey brought this action in the Alpena County Circuit Court against Macomb seeking restitution based upon fraud, misrepresentation, mutual mistake, impossibility of performance and breach by Macomb of its contractual obligations under the agreements between the parties. Macomb filed a motion for change of venue, said motion was granted by the Alpena County Circuit Court judge and venue was moved to Macomb County Circuit Court on December 9, 1974. Sentry then joined Dubey as a party-plaintiff. On March 12, 1975, Macomb filed a counter-

claim against both Dubey and Sentry seeking
money damages for breach of contract. The issues
were joined for trial by jury which commenced in
the Macomb County Circuit Court on March 2,
1976.

The defendant raises four issues on appeal that
have been restated and rearranged into three
issues for consideration.

The first issue is whether the July 17, 1974,
agreement to extend the time of Dubey's perform-
ance was binding on Macomb so as to give rise to a
cause of action for Macomb's breach where the
agreement involved multiple parties, not all of
which signed, but where Macomb took action con-
sistent with the agreement in regards to Dubey.

The defendant maintains that the trial court
should have granted its motion for a directed
verdict because there was no evidence presented
by Dubey that defendant Macomb, after learning
of the Cle-Tex repudiation of the amended con-
tract, did any act which evidenced an intention to
be bound notwithstanding the refusal of Cle-Tex to
sign the document.

In *Sexton v American Aggregates,* 60 Mich App
524, 530–531; 231 NW2d 449 (1975), the standard
for review of a motion for a directed verdict was
set out as follows:

"In reviewing a claim that a motion for directed
verdict was erroneously denied, the Court must view
evidence in a light most favorable to plaintiff. If, when
doing so, the Court determines that there is 'any evi-
dence which was competent and sufficient to support
the jury's determination', the jury's resolution of the
case should be affirmed." (Citations omitted.)

A motion for judgment notwithstanding the ver-
dict is reviewed even more strictly, since the facts

are viewed inferentially in favor of a non-moving party. *Jackson v Fox,* 69 Mich App 283, 285; 244 NW2d 448 (1976), *lv den* 399 Mich 863 (1977). With this standard in mind, we review the evidence to see whether the trial judge erred in denying the motion for a directed verdict and for a judgment notwithstanding the verdict.

The July 17, 1974, agreement was to be signed by Dubey, Macomb, Cle-Tex and Sentry Insurance. Although Sentry and Cle-Tex did not sign the agreement, both Dubey and Macomb signed it, along with a security agreement providing for Wayne Dubey's personal guarantee, and a promissory note from Dubey to Macomb.

Where there are multiple parties to a contract, a signatory has the burden of proving that it was the intent of all of the parties that none would be bound unless all signed. *Palman v Reynolds,* 310 Mich 35, 39–40; 16 NW2d 657 (1944). In *Wiegand v Tringali,* 22 Mich App 230, 234; 177 NW2d 435 (1970), this Court indicated that intent to be bound is a question of fact:

> "[T]hose who do sign the writing may have intended to be bound by its terms even though less than all the named persons sign. Their intention governs. The intention of the parties is a fact to be decided upon the evidence, not by invoking our personal, professional, or judicial experience."

In the instant case, the agreement does not explicitly provide that it is not to be binding until all parties sign. *Wiegand, supra,* p 235.

Defendant claims that its actions subsequent to the signing of the July 17, 1974, agreement can be

explained away and are not evidence of an intent to be bound by the agreement. While these facts might be interpreted in the light sought by defendant, this Court's review of the judgment notwithstanding the verdict motion requires that the facts be taken inferentially in plaintiffs' favor and not defendant's. *Jackson v Fox, supra.* While defendant presents a plausible argument that the payment to Cle-Tex was to preserve Macomb's rights under the lease, that Cle-Tex was threatening to forfeit, the payment is consistent with the agreement and must be taken inferentially to support plaintiffs' claim that the payment was made pursuant to the July 17 agreement. The most damaging evidence showing that defendant intended to be bound by the July 17 agreement is the July 29, 1974, telegram in which Macomb claimed the benefit of the note executed pursuant to the agreement. The telegram reads as follows:

"PMS WAYNE DUBEY, PRESIDENT DLR
EARL DUBEY & SONS INC. DRAWER O
CLEVELAND TX 77327

"DEMAND IS HEREBY MADE UPON YOU FOR IMMEDIATE PAYMENT OF THE FULL AMOUNT DUE UNDER THAT CERTAIN PROMISSORY NOTE DATED JULY 17, 1974 BETWEEN EARL DUBEY & SONS, INC. AS MAKER AND MACOMB CONCRETE CORPORATION AS PAYEE. THIS INDEBTEDNESS IS IN THE PRINCIPAL AMOUNT OF $178,591.55 PLUS INTEREST THEREON AT THE RATE OF 12-1/4 PER CENT FROM JULY 17, 1974, TO DATE. THIS INDEBTEDNESS IS PAYABLE AT THE OFFICES OF PAYEE, MACOMB CONCRETE CORPORATION, 33180 KELLY ROAD, FRASER, MICHIGAN, IMMEDIATELY.

"DEMAND IS ALSO HEREBY MADE UPON YOU PERSONALLY FOR IMMEDIATE PAYMENT OF THIS INDEBTEDNESS UNDER THE GUARANTY MADE AND ENTERED INTO BY YOURSELF AS AN INDIVIDUAL ON JULY 17, 1974.

"EARL DUBEY & SONS, INC. HAS NOT PRODUCED CON-

TRACT SPECIFIED QUANTITIES OF MATERIAL UNDER ITS AGREEMENTS WITH MACOMB CONCRETE CORPORATION, AND EARL DUBEY & SONS, INC. IS IN DEFAULT OF ITS OBLIGATIONS THEREUNDER. YOUR ATTENTION IS RESPECT-FULLY CALLED TO PARAGRAPH 3 OF THE SAND AND GRAVEL REMOVAL AGREEMENT AND BOND APPROVAL DATED MAY 28, 1974 ENTERED INTO BY EARL DUBEY & SONS, INC., MACOMB CONCRETE CORPORATION AND SENTRY INSUR-ANCE, A MUTUAL COMPANY. UNDER THAT PARAGRAPH, EARL DUBEY & SONS, INC. AGREED THAT IF IT COULD NOT PRODUCE CONTRACT QUANTITIES OF MATERIAL, IT WOULD VOLUNTARILY QUIT THE PREMISES AND SURRENDER POSSES-SION OF ALL EQUIPMENT AT OR NEAR THE SITE TO MACOMB CONCRETE CORPORATION. MACOMB CONCRETE CORPORA-TION HAS ACCORDINGLY TAKEN POSSESSION OF THE PREM-ISES AND ALL EQUIPMENT AT OR NEAR THE PREMISES PREVIOUSLY OCCUPIED BY EARL DUBEY & SONS, INC. UNDER ITS AGREEMENTS WITH MACOMB. MACOMB CON-CRETE CORPORATION WILL OPERATE THE FACILITIES LO-CATED THERE IN AN EFFORT TO MITIGATE THE DAMAGES SUSTAINED BY IT DUE TO EARL DUBEY & SONS, INC.'S DEFAULT.

> "CHARLES G. KING
> BRACEWELL & PATTERSON
> 1808 FIRST CITY NATIONAL BANK BUILDING
> HOUSTON, TEXAS 77002
> ATTORNEYS FOR MACOMB CONCRETE CORPORA-TION."

Additionally, defendant claims that there was no evidence that it took any further action in reliance on the July 17 agreement after learning that Cle-Tex would not sign the agreement. This is not supported by the record. James Hicks, an execu-tive vice-president of Macomb, testified as follows:

"Q. [Plaintiffs' attorney] Now, when did you learn that Cle-Tex had refused to go through with signing the documents that were prepared on July 17th?

"A. Oh, my guess is it was within a day or two after that date."

Therefore, Macomb knew on either July 18 or 19 that Cle-Tex was not going to sign the agreement. However, the security agreement was filed on July 22, 1974. Also, the telegram demanding payment under the July 17 note was dated July 29, 1974. Thus, defendant did take further action after it had knowledge that Cle-Tex would not sign the agreement.

Given the evidence that defendant proceeded under the advantageous portions of the July 17 agreement, this Court holds that there was sufficient evidence for the jury to make a finding of intent to be bound even though the parties other than Dubey and Macomb did not sign the agreement. Thus, there was no error in denying the motion for directed verdict. Additionally, when these facts are viewed inferentially in plaintiffs' favor, no error can be predicated on the denial of the motion for judgment notwithstanding the verdict.

The next issue is whether the July 17 agreement was unenforceable as illusory so as to preclude a finding of defendant's breach inasmuch as the agreement in part gave defendant the option at its sole discretion to make advance payments to plaintiff, but where the agreement also extended the time of plaintiff's performance and was supported by consideration for the extension of time.

Defendant maintains that even assuming, *arguendo,* that defendant evidenced an intention to be bound by the July 17 agreement, the agreement imposed no legal duties on it, as it was completely discretionary with the defendant whether or not to

make advance payments to plaintiff. Therefore, the promise was illusory and the contract lacked mutuality of obligation.

The July 17 agreement provided the following in regard to the agreements of Macomb:

"Contemporaneously herewith, Macomb has agreed to advance to Dubey certain amounts pursuant to a promissory note and security agreement of even date herewith. In addition *Macomb agrees to the extension of time of performance of the Removal Agreement as set forth in this Agreement.*" (Emphasis added.)

The promissory note provided in part as follows:

"Payee shall have the option at its discretion, but shall be under no obligation whatsoever, to make any advancement either on its own motion or pursuant to a written request by Maker (supported by such documentation as payee may request) that such an advancement be made to satisfy, in whole or part, a debt necessarily incurred in connection with Maker's production of specification materials relating to Houston Intercontinental Airport Contract No. 101."

This provision regarding advancements of money is unenforceable since it is dependent on "the will of the promisor", *Carlson v Johnson,* 275 Mich 35, 37; 265 NW 517 (1936). However, this is not the sole promise made by Macomb in the July 17 agreement and it cannot be said that the entire agreement is unenforceable. In *Alderton v Williams,* 139 Mich 296, 298–299; 102 NW 753 (1905), the Michigan Supreme Court indicated that a portion of a contract that is unenforceable will not vitiate an entire contract where there are promises that are enforceable. The Court in *Alderton* stated:

"Plaintiff insists that the contract relied upon by defendants is void for indefiniteness and want of mutuality. It is true that in certain particulars the contract is indefinite. * * * We are referred to no authority, and we believe there is no authority, which holds that indefiniteness in details of this character makes an entire contract void."

While *Alderton* is not completely parallel to the instant case, it is reasonable that if portions of a contract are unenforceable by its terms, it will not affect the enforceability of other portions of the contract that are valid.

Although the advance payment portion of the agreement is unenforceable, under paragraph 2.3 of the July 17 agreement, the time for Dubey's performance was extended to September 15, 1974. The extension of time for performance was an enforceable agreement in exchange for Dubey's promises to pay additional sums and personally guarantee the note securing the advancements. This time extension was one of the principal considerations for Dubey not only executing the agreement of July 17, but also for the execution of the promissory note payable to Macomb Concrete in the amount of $543,000 and Dubey's personal guarantee of that note and security agreement by which Dubey gave Macomb a lien on all its equipment in Texas. This consideration was adequate to make the contract legally binding on both sides.

The final issue is whether the jury was properly allowed to award reliance damages to Dubey for defendant's breach of the agreements between the parties.

The jury awarded Dubey $313,661.56 which represented the difference between the expenditures of Dubey which totaled $542,261,56, minus the prior advances made by Macomb which totaled

$178,000 and two improperly included items in Dubey's damage exhibit which totaled $50,600. Thus, Dubey received the amount it spent on this project minus the advance payments by Macomb.

The defendant claims that the foregoing measure of damages is improper, the proper measure being the contract price less the cost of completion. In other words, the nonbreacher is entitled to its profit. Furthermore, defendant maintains that plaintiff could not make a profit on this contract because the cost of completion would have exceeded the contract price; therefore, defendant, by preventing Dubey's performance, kept Dubey from incurring a loss on the contract. Thus, defendant is only liable for nominal damages.

Expenses as an alternative remedy for breach of a contract are discussed in 17 CJ, Damages, § 172, pp 855–856:

"(5) Prevention of Performance. Where, without fault on his part, one party to a contract who is willing to perform it is, by the other party, prevented from doing so, the primary measure of damages is the amount of his loss, or, as it has been otherwise expressed, the value of his contract which may consist of two distinct items, the one being the party's reasonable outlay or expenditure toward performance, and the other the anticipated profits which would have been derived from performance. Plaintiff is entitled to recover the amount which he has upon the faith of the contract fairly and in good faith laid out and expended, and the loss upon material on hand at the time defendant refused to permit him to perform his agreement, together with a fair allowance for his own time and services. Profits may be too remote and speculative to be capable of the clear and direct proof required by law, and in such a case plaintiff is confined to his loss of actual outlay and expense. Failure to prove profits, however, will not prevent a recovery for outlay and expense." (Footnotes omitted.)

See also, 17 ALR2d 1327, § 9. This approach was adopted by the Michigan Supreme Court in *Tross v. H E G Clarke Co,* 274 Mich 263, 265–266; 264 NW 365 (1936), wherein the Court stated:

"Generally speaking, the measure of damages would be loss of profits to plaintiff from the prevention of performance. But where the profits are wholly speculative and unprovable, the one who prevents performance may not go scot-free.

" 'Unless there is some artificial rule of law which has taken the place of natural justice in relation to the measure of damages, it would seem to be quite clear that the claimant ought at least to be made whole for his losses and expenditures.' *United States v Behan,* 110 US 338, 344 (4 Sup Ct 81.)

"Where profits are speculative, the measure of damages is the actual expenditures and value of services reasonably spent in a *bona fide* attempt to perform the contract or reasonably expended upon the faith of the contract. *United States v Behan, supra;* 17 CJ p 855; *Feldman v Wear-U-Well Shoe Co.,* 191 Mich 73 [157 NW 395 (1916)]."

Therefore, plaintiff could properly seek reliance damages based on the reasonable expenses incurred attempting to perform the contract.

Defendant claims that Dubey would have lost money if it had completed the contract. We point out that the executive vice-president of Macomb, James Hicks, testified that Dubey would have been paid additional sums beyond the $543,000 contract price had Dubey completed the contract.

Defendant's argument that the expenses for which Dubey recovered were attributable prior to the July 17 amended agreement is generally correct. However, this does not change our decision because the agreements of January 31, May 28

and July 17 should be viewed as a whole. In fact, the July 17 agreement provides:

> "*Provisions of Other Agreements.* All provisions of the Removal Agreement,[1] the Amendment,[2] and the Equipment Lease in effect immediately prior to the execution hereof shall remain in effect unless specifically amended herein. The Removal Agreement, as amended, and the Equipment Lease shall be deemed to be amended by this Agreement to the extent specifically set forth herein. In addition, Macomb and Cle-Tex, by their execution hereof, do not waive any claim, demand, action or cause of action against Dubey or Sentry arising from, out of or in any manner connected with such agreements."

So viewed, the contractual relationship between the parties is indivisible and the reliance damages cannot be apportioned between the original and the subsequent agreement for extension of time.

Affirmed. Costs to defendant.

[1] The January 31, 1974, agreement.

[2] The May 28, 1974, agreement.