USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT No. 96-1398 CLAIR INTERNATIONAL, INC. AND FOREIGN MOTORS WEST, INC., Plaintiffs, Appellants, v. MERCEDES-BENZ OF NORTH AMERICA, INC., Defendant, Appellee.  ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. William G. Young, U.S. District Judge] ___________________  ____________________ Before Selya, Circuit Judge, _____________ Aldrich and Cyr, Senior Circuit Judges, _____________________  ____________________ Richard B. McNamara, with whom Gregory A. Holmes and Stephanie A. ___________________ _________________ ____________ Bray were on brief for appellants. ____ Mark P. Szpak, with whom Peter K. Levitt and Ropes & Gray were on _____________ _______________ ____________ brief for appellee.  ____________________ September 5, 1997  ____________________ CYR, Senior Circuit Judge. Plaintiffs Clair CYR, Senior Circuit Judge.  ________________________ International, Inc. and Foreign Motors West, Inc. appeal from a district court judgment dismissing their respective claims for breach of contract and violation of Mass. Gen. Laws ch. 93B against Mercedes-Benz of North America ("MBNA"), the North American distribution organization for Mercedes-Benz automobiles. The central controversy concerns whether the restructuring effected by MBNA among its franchisees in the Greater Boston area during the mid-1990s breached its dealership agreement with plaintiffs-appellants. We affirm the district court judgment. I I BACKGROUND BACKGROUND __________ During the early 1990s, MBNA was represented by two dealerships in the North Shore area of Greater Boston: Auto Engineering, Inc. ("Auto Engineering"), located in Burlington, and Gauthier Motors, Inc. ("Gauthier"), located in Salem. Auto Engineering closed in April 1993,1 leaving Gauthier as the only MBNA presence on the North Shore. Gauthier, among the older Mercedes-Benz dealerships in the United States, operated from what MBNA considered an inadequate facility, a small, outmoded dealership located in downtown Salem. In early 1993, MBNA approved a plan for relocating the Gauthier dealership to Route  ____________________ 1Auto Engineering relocated its dealership without MBNA authorization on November 2, 1992. See McLane v. Mercedes-Benz ___ ______ _____________ of North America, Inc., 3 F.3d 522, 523 (1st Cir. 1993). As a _______________________ result, Mercedes gave notice of termination. Auto Engineering then obtained a temporary injunction prohibiting termination until April 11, 1993, at which time the injunction expired. See ___ id. at 523-24. See infra p. 9. ___ ___ _____ 2 128, which would enable it to service the entire North Shore area. Whereupon, Gauthier began its search for an outside investor to finance its relocation plan.  Unable to secure a suitable investor, in October 1994 Gauthier decided to sell its dealership outright to Michael Cantanucci, an experienced automobile dealer who already owned more than twenty non-MBNA franchises. In due course, Cantanucci obtained a purchase and sale agreement on a parcel of land along Route 128, as the site of the proposed new, exclusive MBNA dealership. After completing a routine "due diligence" check, which took approximately one month, MBNA approved the franchise transfer to Cantanucci.  The exclusivity provision was important to MBNA, which faced increased competition from new luxury automobile lines and planned to shift to larger, exclusive dealerships in order to meet the challenge. At the time, moreover, MBNA had no exclusive dealership in the Greater Boston area, and Mercedes-Benz was developing several new products, at least one of which, a sports utility vehicle, was to be sold only at exclusive dealerships. Upon learning of the proposed location for the Cantanucci dealership, Herb Chambers, a Mercedes-Benz dealer in Somerville, Massachusetts, protested to MBNA, claiming that the proposed Route 128 site was too close to his Somerville dealership. In December 1994, Chambers brought an action against MBNA to enjoin construction of its proposed Route 128 dealership. Although the suit was dismissed in April 1995, six months had 3 elapsed during which Cantanucci had not proceeded with construction of the new dealership facility due to the Chambers litigation. Meanwhile, differences were developing between MBNA and Cantanucci concerning the proposed new dealership, particularly the timetable for construction, since MBNA had been without adequate North Shore representation for approximately two years. Moreover, during the summer of 1995 Cantanucci had agreed to acquire a Mercedes dealership in Connecticut, which concerned MBNA for two reasons. First, MBNA had never dealt with Cantanucci before, yet suddenly was faced with the prospect that he could control two MBNA dealerships in New England. Second, the $10,000,000 investment required for the Connecticut dealership could leave Cantanucci without adequate financing to proceed with the North Shore dealership, where MBNA considered an adequate Mercedes-Benz presence vital.  These concerns were borne out when Cantanucci approached MBNA for permission to construct a smaller facility on Route 128, then attempted to renege on the exclusivity provision. Although Cantanucci later agreed to meet the original terms after MBNA declined his request, the new permanent facility on Route 128 could not be completed for approximately ten more months, and Cantanucci declined to open a temporary service facility during the interim as MBNA had requested. At this point, with Gauthier running out of operating capital and MBNA confronting the prospect that there might soon 4 be no Mercedes-Benz presence on the North Shore, MBNA decided to offer its North Shore dealership to Chambers. The MBNA decision was based in part on its perceived need to move quickly, due to the extended period during which the North Shore had been without a suitable Mercedes-Benz presence, especially in light of the competition from new luxury automobile lines being marketed at large, exclusive dealerships. Further, MBNA considered Chambers the Mercedes-Benz dealer best able to become an immediate force in the North Shore market area. As an established Massachusetts automobile dealer, Chambers had access to advertising opportunities on a scale no new dealer could match. Indeed, MBNA regarded Chambers as its top dealer in the Greater Boston area, especially since he had the highest profit margin and was rated its best dealer "at point of sale."2 Moreover, Chambers was well capitalized and planned to proceed immediately with construction of an exclusive dealership facility ___________ meeting all MBNA specifications, on a very desirable site he already owned in Danvers, Massachusetts. In the meantime, Chambers had agreed to operate a temporary MBNA dealership facility at a site in Lynnfield, Massachusetts, pending construction of the permanent facility. Finally, he not only agreed to operate an exclusive Mercedes-Benz dealership on the North Shore, but to convert his existing  ____________________ 2The "point of sale" rating assesses the degree of customer satisfaction with the dealer at the time the vehicle is purchased. Chambers fared less well in terms of the vehicle "service" rating. 5 Somerville dealership to an exclusive dealership as well, giving MBNA two exclusive dealerships in an important market area where it had none. At this point, MBNA approached Cantanucci, explaining that it intended to honor its commitment to him but would prefer that the North Shore dealership go to Chambers. MBNA offered to make Cantanucci whole, however, by reimbursing him for the amount paid to Gauthier for the North Shore franchise, as well as any out-of-pocket costs incurred.3 In August 1995, Cantanucci readily agreed to withdraw. On September 27, 1995, Gauthier ceased to operate, leaving MBNA with no permanent Mercedes-Benz dealership on the North Shore, though Chambers was operating the temporary dealership in Lynnfield, Massachusetts. See supra p. 5. ___ _____ Thereafter, MBNA never sought another candidate for the North Shore area, having already concluded, even before Gauthier proposed Cantanucci, that Chambers was the preferred candidate, except for the fact that Chambers already owned a Mercedes-Benz ______ ___ ___ ____ ____ ________ _______ _____ _ _____________ dealership in Somerville, a contiguous MBNA market area. __________ __ __________ _ __________ ____ ______ ____ MBNA had a longstanding policy against granting the same dealer more than one dealership in contiguous market areas. Its dealership agreements in 1992 stated the policy as follows:  [T]o foster competition among Mercedes-Benz  ____________________ 3MBNA further proposed to make up any difference between the price Cantanucci had paid to acquire the Route 128 site, and the price received for it. Ultimately, however, Cantanucci sold the land to Chambers for the original purchase price. But see infra ___ ___ _____ pp. 16-17. 6 dealers, it is Mercedes-Benz's policy not to permit, except in extraordinary ______ __ _____________ circumstances, an existing dealer, owner, or _____________ operator to have interest in the ownership or management of another competitive Mercedes- Benz sales and service dealership in the same area of responsibility or in a contiguous market area.  (Emphasis added.) Nonetheless, a standard dealership agreement provision states:  Notwithstanding any provision of this Agree- ment, the final decision whether to establish ___ _____ ________ _______ __ _________ additional dealers, or relocation of [sic] an __________ _______ existing dealer, shall be made by MBNA solely _____ __ ____ __ ____ ______ pursuant to its own business judgment, and ________ __ ___ ___ ________ ________ nothing in this Agreement shall be construed to require Dealer's consent to the establishment of an additional dealer or relocation of an existing dealer. (Emphasis added.) This "business judgment" provision and all other standard dealership agreement provisions are incorporated by reference into each dealership agreement.  By the time MBNA awarded the North Shore dealership to Chambers, however, it was operating under a policy adopted in April 1993: [A] policy that existed in the past which _ ______ _____ prohibited a proven successful Mercedes-Benz __________ _ __________ operator from operating more than one Point, ________ ____ _________ ____ ____ ___ _____ does not lend itself to the most effective ____ ___ ____ ______ __ and efficient way to meet today's competitive ____ _______ ___________ challenges. Today it is the strength of the __________ overall dealership operation that insures customer satisfaction in terms of products and services.  Therefore, it is in our best interests to __ __ __ ___ ____ _________ __ permit, in appropriate circumstances, the ______ __ ___________ _____________ common ownership of more than one dealer ______ _________ __ ____ ____ ___ ______ point for the express purpose of meeting the _____ challenges of a competitive marketplace. 7 (Emphasis added.)4 On December 4, 1995, three dealers brought suit against MBNA: Clair International, Inc., located in Dedham; Foreign Motors West, Inc., located in Natick; and Smith Motor Sales of Haverhill, Inc., in Haverhill. Their complaint alleged that awarding Chambers a second dealership, to be based in Danvers  a market area contiguous to the Somerville market area where Chambers already had a dealership breached their dealership contracts and violated Mass. Gen. Laws ch. 93B. The complaint sought only to enjoin Chambers from opening and operating a new dealership in Danvers, Lynnfield, or any other area contiguous to the Somerville dealership. Following a three-day bench trial, the district court found that MBNA had breached its contract with Smith, though not with Clair or Foreign Motors.5 It determined that the dealership provision governing contiguous market areas, see supra pp. 6-7, ___ _____  ____________________ 4Although MBNA did not provide advance notice to existing dealers regarding its amended policy, appellants raise the notice issue solely in connection with their belated attempt to assert a chapter 93B claim independently of any breach-of-contract claim. See infra pp. 16-17 & note 7. ___ _____ 5The trial court decided that MBNA's conduct vis-a-vis Smith had been based on a "mixed" motive. It found that Smith did not operate the type of dealership MBNA wanted to work with in the future and that MBNA had already tried to persuade Smith to relocate to the larger Manchester, New Hampshire, market. Thus, the court found that MBNA had installed Chambers not only to meet its own pressing marketing needs in the North Shore area, but also to foster its goal of promoting larger dealerships. The district court further found that MBNA had not violated Mass. Gen. Laws ch. 93B, however, and denied the injunctive relief requested by Smith. Finally, since the court directed that a trial on damages be scheduled in the Smith case at a later date, Smith is not a party to the present appeal. 8 was contractual in nature, rather than a mere recital of company policy. The court nonetheless ruled that the unambiguous contract language required it to ascertain, from the vantage ____ ___ _______ point of MBNA, whether or not "extraordinary circumstances" _____ __ ____ warranted its business judgment to install Chambers in an additional dealership in a contiguous market area. The court went on to find that the demise of the Gauthier dealership, coupled with the closing of Auto Engineering, see supra note 1, ___ _____ had given rise to an extraordinary circumstance in the eyes of MBNA. The court further found that it was vital to MBNA that Chambers be installed in the North Shore dealership, given the extended duration of its dealership problems in the area and the increased competition from other luxury automobile lines. The district court findings foreclosed all relief to Clair and Foreign Motors, whose claims for injunctive relief under chapter 93B were premised exclusively on the alleged breach of their contracts by MBNA. Finally, the district court certified the judgment against Clair and Foreign Motors pursuant to Fed. R. Civ. P. 54(b) ("Rule 54(b)"). II II DISCUSSION DISCUSSION __________ 1. Appellate Jurisdiction  1. Appellate Jurisdiction ______________________ A. Rule 54(b) A. Rule 54(b) _________ MBNA has moved to dismiss the appeal, on the ground that the Rule 54(b) certification was improper. Rule 54(b) permits entry of a final judgment as to fewer than all parties in 9 a civil action upon "an express determination that there is no just reason for delay." After provisionally denying the motion to dismiss, we instructed the parties to brief both the Rule 54(b) certification challenge and whether 28 U.S.C. 1292(a)(1) might afford an alternate jurisdictional ground for the appeal, see part II, 1.B, infra. ___ _____ The Rule 54(b) certification is problematic. First, it includes no findings on the relationship between certified and uncertified claims. See Credit Francais Int'l, S.A. v. Bio-Vita, ___ ___________________________ _________ Ltd., 78 F.3d 698, 706 (1st Cir. 1996); Feinstein v. Resolution ____ _________ __________ Trust Corp., 942 F.2d 34, 39-40 (1st Cir. 1991); Spiegel v. ____________ _______ Trustees of Tufts College, 843 F.2d 38, 43 (1st Cir. 1988). ___________________________ Moreover, our review of the record reveals substantial overlap between the Clair and Foreign Motors cases, on the one hand, and the Smith case awaiting trial in the district court. Yet the present appeal would have us interpret contractual provisions common to all three dealership agreements. See Bio-Vita, 78 F.3d ___ ________ at 707-08 (Rule 54(b) certification improvidently granted in light of overlap between certified and pending claims); Kersey v. ______ Dennison Mfg. Co., 3 F.3d 482, 487-88 (1st Cir. 1993) (Rule 54(b) _________________ certification improper given interlocking factual issues common to adjudicated and unadjudicated claims); Spiegel, 843 F.2d at _______ 44-45 (Rule 54(b) certification improper where dismissed and pending claims "stem from essentially the same factual averments"). Second, the central benefit identified in the district 10 court's decision to certify the adverse judgments against Clair and Foreign Motors that the appellate court might resolve the Mass. Gen. Laws ch. 93B claims in the process is illusory, especially since the district court has yet to address any chapter 93B claim. See infra p. 16.6  ___ _____ B. Interlocutory Jurisdiction (28 U.S.C. 1292(a)(1)) B. Interlocutory Jurisdiction (28 U.S.C. 1292(a)(1)) ___________________________________________________ The courts of appeals are invested with jurisdiction over appeals from "[i]nterlocutory orders of the district courts . . . granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions." 28 U.S.C. 1292(a)(1). Clair and Foreign Motors have not demonstrated that section 1292(a)(1) confers appellate jurisdiction over their claims.  The district court order had the practical effect of denying injunctive relief to these appellants. See, e.g., ___ ____ Manchester Knitted Fashions, Inc. v. Amalgamated Cotton Garment & _________________________________ ____________________________ Allied Indus. Fund, 967 F.2d 688, 690 (1st Cir. 1992) (partial ___________________ summary judgment had practical effect of granting injunction); Plymouth Cty. Nuclear Info. Comm., Inc. v. Boston Edison Co., 655 _______________________________________ _________________ F.2d 15, 17-18 (1st Cir. 1981) (order precluding injunctive relief on stricken claims had "practical effect" of denying  ____________________ 6We would have no occasion to address any chapter 93B claim at the present time. Were we to conclude that the district court erred in its interpretation of the dealership contract, or in its determination that MBNA did not breach the contract, we would remand to the district court for further consideration of the Clair and Foreign Motors claims. As there is no chapter 93B ruling to review, however, our remand order would leave any such claims for resolution by the district court in the first instance. 11 injunction). Consequently, appellants must satisfy the test set out in Carson v. American Brands, Inc., 450 U.S. 79, 84 (1981). ______ _____________________ There, the Supreme Court announced that an interlocutory order which has the practical effect of granting, denying, or altering an injunction, is not immediately appealable as of right under section 1292(a)(1), unless the appellant can ______ show that the order "might have a serious, perhaps irreparable, consequence, and that [it] can be effectually challenged only by immediate appeal." Id. (internal quotation marks omitted). See ___ ___ also Casas Office Machines, Inc. v. Mita Copystar America, Inc., ____ ___________________________ ___________________________ 42 F.3d 668, 672-73 (1st Cir. 1994). Appellants, however, have identified no immediate and irreparable harm that would be occasioned were the district court order not immediately appealable.  Nevertheless, given both the problematic nature of the Rule 54(b) certification and the time which has passed since its entry, we conclude that the interests of justice are best served by proceeding to the merits. See United States v. Connell, 6 ___ ______________ _______ F.3d 27, 29 n.3 (1st Cir. 1993) (It is well settled that "an appellate court may forego the resolution of a jurisdictional question if, as is true here, the appeal is uncomplicated and easily resolved in favor of the party to whose benefit the jurisdictional question would redound."); see also Norton v. ___ ____ ______ Mathews, 427 U.S. 524, 532 (1976); Sierra Club v. Larson, 2 F.3d _______ ___________ ______ 462, 466 (1st Cir. 1993); In re Unanue Casal, 998 F.2d 28, 33 ___________________ (1st Cir. 1993); Narragansett Indian Tribe v. Guilbert, 934 F.2d __________________________ ________ 12 4, 8 n.5 (1st Cir. 1991); Federal Deposit Ins. Corp. v. Caledonia __________________________ _________ Inv. Corp., 862 F.2d 378, 381 (1st Cir. 1988). __________ 2. Construing the Dealership Agreements 2. Construing the Dealership Agreements ____________________________________ The dealership agreements included two provisions directly pertinent to the MBNA decision to install Chambers in the North Shore area dealership. The first provision prohibits MBNA from awarding franchises to the same dealer in contiguous market areas except in "extraordinary circumstances." The second provision sweeps more broadly, however, enabling MBNA to exercise its business judgment as to whether an additional franchise should be awarded to an existing dealer in a contiguous market area.  The district court made two important legal rulings regarding these provisions. First, it held that the "extraordi- nary circumstances" provision is contractual in nature and binding upon MBNA. It then construed the "extraordinary circumstances" provision in relation to the "business judgment" provision, as follows:  But what does it mean? In the context read in light of the more sweeping clause . . . which leaves to Mercedes-Benz the virtually unfettered, save by the covenant of good faith and fair dealing . . . what does this more limited but more precise clause mean? Legally . . . to read it in harmony in . . . a way that effectuates the intention of the parties, it means that this clause is read such that, absent extraordinary circumstances in the eyes of Mercedes-Benz, they will not appoint a dealer to have two points in contiguous market areas and that they will interpret the implementation of this policy in a fashion as to foster competition, to give the phrase to foster competition 13 significance, in its context. Now, that's what this language means on its face. Thus, the district court rejected both the MBNA claim that the "extraordinary circumstances" provision was simply a policy statement, and the theory advanced by appellants that the "business judgment" provision had no application in the present context.  Appellants challenge the district court ruling on the ground that its "extraordinary circumstances" determination should have been based on an objective reasonableness standard, not merely on reasonableness in the eyes of MBNA. As the present claim challenges the district court's construction of unambiguous contractual terms in an integrated agreement, we review de novo __ ____ the "plain meaning" the district court ascribed to these terms. State Police Ass'n v. Commissioner of Internal Revenue, No. 97- __________________ _________________________________ 1319, slip op. at 5 (1st Cir. Aug. 20, 1997); United States ______________ Liability Ins. Co. v. Selman, 70 F.3d 684, 687 (1st Cir. 1995). ___________________ ______ The choice-of-law provision in the dealership agreement designates New Jersey law. See McCarthy v. Azure, 22 F.3d 351, ___ ________ _____ 356 n.5 (1st Cir. 1994) (reasonable choice-of-law provision to be respected). Since MBNA has its principal place of business in New Jersey, we honor this designation. As the district court recognized, "a document should be read to give effect to all its provisions and to render them consistent with each other." Mastrobuono v. Shearson Lehman ___________ ________________ Hutton, Inc. 115 S. Ct. 1212, 1219 (1995) (Illinois law; citing ____________ RESTATEMENT (SECOND) OF CONTRACTS 203 and cmt. b (1979); 202 14 (5)); see also Coolidge & Sickler, Inc. v. Regn, 80 A.2d 554, 557 ___ ____ ________________________ ____ (N.J. 1951) ("'The design of the parties to a written contract is to be collected from the instrument as an entirety. . . . Words, phrases and clauses are not to be isolated but related to the context and the contractual scheme as a whole, and given the meaning that comports with the probable intention. The literal sense of the terms may be qualified by context.'" (quoting Mantell v. International Plastic Harmonica Corp., 55 A.2d 250, _______ ______________________________________ 255 (N.J. 1947))); Andreaggi v. Relis, 408 A.2d 455, 468 (N.J. _________ _____ Super. 1979) ("All provisions of a document must be read and should be harmonized where possible in interpreting a docu- ment."). Unlike appellants, the district court construed the dealership agreement as a whole, in the sense that it did not render meaningless the broad contractual caveat that MBNA, in the exercise of its exclusive business judgment, was to be the ultimate arbiter. Thus construed, the "extraordinary circum- stances" provision simply encapsulates the essential nature of the business judgment MBNA is permitted to make regarding whether to award the same dealer more than one dealership in contiguous market areas. 3. "Extraordinary Circumstances" 3. "Extraordinary Circumstances" ___________________________ The district court based its "extraordinary circumstances" determination on the evidence adduced at trial. Focusing especially on the extended period during which MBNA had been without adequate representation on the North Shore, it found that "the demise or imminent demise of Gauthier on the North 15 Shore, coupled with the squeezing out of Auto Engineering . . . [was] an extraordinary circumstance in the eyes of Mercedes." We review its finding only for "clear error." Selman, 70 F.3d at ______ 687 ("clear error" standard "pertains whenever the trial court decides factual matters that are essential to ascertaining the parties' rights in a particular situation (though not dependent on the meaning of contractual terms per se)"). The district court reasonably found that the extended absence of an adequate MBNA presence on the North Shore constituted an extraordinary circumstance in the eyes of MBNA, especially since MBNA was facing aggressive competition from new luxury automobile lines operating from large, exclusive dealerships, whereas MBNA had no exclusive dealership in the North Shore market area and soon could be without any dealership there. MBNA's decision to award a North Shore dealership to Chambers in these extraordinary circumstances, see supra Section ___ _____ I, was well within the broad and exclusive "business judgment" discretion conferred upon it by the dealership agreement. There was no clear error. Next, we consider appellants' claims under Mass. Gen. Laws ch. 93B. Since there was no breach of contract by MBNA, their chapter 93B claims fail as well. See supra pp. 10-11 & ___ _____ note 6.  Appellants assert that MBNA promulgated a secret policy inconsistent with the contractual restrictions on multiple dealerships in contiguous market areas, and that MBNA "secretly 16 subsidized" Chambers by affording him financial assistance in acquiring the Route 128 property from Cantanucci. See supra note ___ _____ 3. Appellants mischaracterize the trial court record, however, in attempting to demonstrate that enough evidence of "general unfairness" by MBNA came in by consent, at trial, to raise the specter of a chapter 93B violation notwithstanding the absence of a breach of contract. The district court initially excluded all evidence of subsidies, since appellants had never alleged a chapter 93B claim independent of their breach-of-contract claims.7 Clair and Foreign Motors then changed course, and ultimately the proffered evidence was admitted, but only to establish "extraordinary circumstances." We cannot conclude, on such a record, that the proffered evidence came in by consent to establish "general unfairness." To the contrary, neither MBNA nor the district court acquiesced, let alone consented, to the trial of a chapter 93B claim predicated on general unfairness. Nor did Clair or Foreign Motors move to amend their pleadings, see Fed. R. Civ. P. ___ 15(b), to reflect their newfound general unfairness theory. Given the explicit restrictions repeatedly imposed by the district court in allowing the "extraordinary circumstances" evidence, we conclude that the general unfairness theory was not tried below. See DCPB, Inc. v. City of Lebanon, 957 F.2d 913, ___ __________ _______________  ____________________ 7Further, based on the fact that the complaint included no independent chapter 93B claim, the district court ruled that MBNA's failure to give its dealers notice of the new policy was immaterial, since MBNA had complied with the "extraordinary circumstances" provision in the dealership agreement.  17 917 (1st Cir. 1992) ("The introduction of evidence directly relevant to a pleaded issue cannot be the basis for a founded claim that the opposing party should have realized that a new issue was infiltrating the case."). See also In re Rauh, ___ ___ ____ ___________ F.3d ___, ___, 1997 WL 394424, *7 (1st Cir. July 18, 1997) (collecting cases). 8 III III CONCLUSION CONCLUSION __________ Accordingly, the district court judgment is affirmed; ___ ________ _____ ________ __ ________ costs to MBNA. _____ __ ____  ____________________ 8Appellants' further contention that an injunction should have been granted under the common-law standard was never raised below. See Violette v. Smith & Nephew Dyonics, Inc., 62 ___ ________ _____________________________ F.3d 8, 10-11 (1st Cir. 1995), cert. denied, 116 S.Ct. 1568 _____ ______ (1996); Desjardins v. Van Buren Community Hosp., 969 F.2d 1280, __________ _________________________ 1282 (1st Cir. 1992) (collecting cases). 18