**BERTERA CHRYSLER PLYMOUTH, INC., Plaintiff,**

v.

**CHRYSLER CORPORATION, Defendant.**

**No. Civ.A. 97–30224–FHF.**

United States District Court, D. Massachusetts.

Jan. 12, 1998.

Mark D. Mason, Cooley, Shrair P.C., Springfield, MA, for Bertera Chrysler Plymouth, Inc., plaintiff.

Robert D. Cultice, George W. Mykulak, Goldstein & Manello, P.C., Boston, MA, Jonathan D Cohen, Goldstein & Manello, Boston, MA, for Chrysler Corporation, defendant.

## MEMORANDUM AND ORDER

FREEDMAN, Senior District Judge.

### I. INTRODUCTION

Disenchanted with the dealership decisions of its national franchisor, plaintiff Bertera Chrysler Plymouth, Inc. ("Bertera") started a civil action in Hampden County Superior Court on October 1, 1997 against the Chrysler Corporation ("Chrysler") for several moving violations, *inter alia,* an infraction of Mass.Gen.Laws ch. 93B, breach of contract, breach of the implied covenant of good faith, and fraud. Chrysler promptly removed to district court on the basis of diversity jurisdiction on October 7, 1997. Having sent Bertera's request for a preliminary injunction back to the shop with engine problems, the Court now considers Chrysler's motion to dismiss Bertera's complaint. Still revved up, Bertera opposes the motion.

### II. STANDARD OF REVIEW

Under Rule 12(b) of the Federal Rules of Civil Procedure, the Court will treat Chrysler's motion to dismiss Bertera's complaint under Rule 12(b)(6) as a motion for summary judgment under Rule 56 and will consider matters outside the pleadings. *See Chapar-*

*ro–Febus v. International Longshoremen Ass'n. Local 1575*, 983 F.2d 325, 332 (1st Cir.1992); *American Express Int'l. Inc. v. Mendez–Capellan*, 889 F.2d 1175, 1178 (1st Cir.1989). The Court notes that the parties had a reasonable opportunity to present additional materials pertinent to Rule 56 consideration. *See EEOC v. Green*, 76 F.3d 19, 24–25 (1st Cir.1996) (noting that court should give parties express notice of intention to convert to summary judgment motion). Bertera submitted a supplemental memorandum opposing summary judgment.

The essential purpose of summary judgment is "to pierce the boilerplate of the pleadings" and appraise the proof to determine whether a trial is necessary. *See Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1st Cir.1992), *cert. denied*, 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993). When summary judgment is at stake, the Court must scrutinize the record in the light most favorable to the nonmoving party, "indulging all reasonable inferences in that party's favor," *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990), yet disregarding unsupported allegations, unreasonable inferences, and conclusory speculation. *See Smith v. F.W. Morse & Co.*, 76 F.3d 413, 428 (1st Cir.1996); *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990). If no genuine issue of material fact percolates through the record and the movant is entitled to judgment as a matter of law, then summary judgment is proper because a trial would serve no useful purpose. *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wynne*, 976 F.2d at 794.

### III. FACTS

This lawsuit centers around competing attempts by Chrysler dealers Bertera and Balise Motor Sales Company ("Balise") to purchase the assets of the Springfield Chrysler dealership. Bertera owns and operates a Chrysler Plymouth dealership in West Springfield, while Balise owns and operates a similar Chrysler Plymouth dealership in neighboring Westfield. Both Balise and Bertera manage their franchises according to a sales and service agreement with Chrysler.

In that standard dealer agreement, Chrysler reserves the right to amend its terms, provided that the amendment applies to each dealership and a Chrysler vice president notifies dealers of the amendment through a signed writing.

On September 23, 1996, Chrysler sent a duly signed memorandum containing marketing guidelines to Bertera and Balise stating that the manufacturer would use the guidelines "in determining whether to approve a dealer applicant ('Applicant') in connection with a buy-sell or other transfer or acquisition of an ownership interest in an existing dealership." In the section on multiple dealer ownership, Chrysler states that it "may limit the number of dealerships an Applicant may have an ownership interest in." Specifically, Chrysler writes, in relevant part, that "an Applicant may be disapproved if a buy-sell or other transfer or acquisition of any ownership interest in an additional dealership would result in ownership of . . . [t]wo Chrysler Corporation dealerships in the same market, but *in no event* two like vehicle line-makes in the same market" (emphasis added). Bertera and Balise compete in the same geographic market as Springfield Chrysler in the sale of the same lines of Chrysler and Plymouth automobiles.

Despite the seemingly adamant prescript of the two dealership guideline, the memorandum explicitly states that "[w]hile Chrysler will make every effort to follow these guidelines, Chrysler reserves the right to depart from them when it is in the interest of the dealer body or Chrysler to do so." The memorandum also notes that "other concerns and issues arise from time to time that may affect the ability of an Applicant to comply with the guidelines or Chrysler Corporation to approve the Applicant." These provisions form the crux of the present dispute.

In late 1996, before a warranty review meeting at Chrysler's regional headquarters in Mansfield, Massachusetts, Bertera's sole owner, Aldo Bertera, allegedly approached Howard Katz, then Chrysler's dealer placement manager for the Boston zone (which includes the Springfield market), about purchasing Springfield Chrysler, whose ownership was looking to sell. Citing the guide-

lines' prohibition on owning two dealerships in the same market area, Katz opined that Chrysler would not allow one dealer two like vehicle line-make dealerships in the Springfield market. Still interested, Bertera approached Katz at a "Five Star Award for Excellence Kickoff Meeting" at the Sheraton Hotel in Springfield in April of 1997 to inquire about purchasing Springfield Chrysler. Katz reminded Bertera of Chrysler's policy in the guidelines. Bertera alleges that he suffered injury by relying on Katz's statements as an absolute denial of any acquisition attempts, and by declining to pursue the purchase of Springfield Chrysler any further.

Around the same time, however, Balise's owner, Jeb Balise, vigorously sought the purchase and relocation of Springfield Chrysler to Wilbraham, despite initially receiving the same opinion from Katz that his dual ownership would conflict with Chrysler's marketing guidelines because a second Balise dealership would be located within the same market. Unsatisfied with Katz's response, Balise brought his cause up to Chrysler's Boston zone manager, Robert Clark. After pressing the point that the Wilbraham location would benefit Chrysler's position in the market better than Springfield Chrysler's dilapidated facilities, Balise obtained Clark's backing. Clark informed Balise that he would support recommending to Chrysler's marketing review committee in Auburn Hills, Michigan— the body that both Bertera and Balise knew had ultimate authority to approve dealer applications—that the manufacturer make an exception to the marketing guidelines' two dealership prohibition and approve Balise's application for a Wilbraham franchise. Consequently, after signing a purchase and sale agreement with Springfield Chrysler's ownership on August 15, 1997, Balise submitted its formal dealership application to Clark's office. Clark forwarded the application to the review committee in Michigan, recommending approval.

On September 3, 1997, Bertera wrote to Clark objecting to Chrysler's consideration of Balise's application. Bertera stated that

Katz had declared that " 'No Way' would Chrysler allow one dealer two like vehicle line-makes in the Springfield market." Further, Bertera's counsel wrote to Clark on September 17 to object to Chrysler's consideration of Balise's application. The next day, Clark sent a notice to Bertera that Chrysler was asked to approve the purchase and relocation. This lawsuit ensued in state court and Chrysler removed to this Court.[1]

The Court denied Bertera's request for an injunction to prevent Chrysler from approving the sale of Springfield Chrysler to Balise and to prohibit Balise from owning or operating a dealership in the Springfield market. At oral argument, Chrysler's counsel noted that the company would approve Balise's acquisition and transfer of Springfield Chrysler in mid-November. Accordingly, the Court proceeds under the assumption that the transfer has been approved and consummated.

## III. DISCUSSION

### A. *Chapter 93B Claim*

Bertera alleges that Chrysler engaged in arbitrary, unconscionable, and bad faith actions, in violation of Mass.Gen.Laws ch. 93B, § 4(1), by considering Balise's application after a "refusal to allow Bertera the opportunity to bid on Springfield Chrysler's assets." Chrysler responds that Bertera lacks standing under chapter 93B, section 12A.

■ Chapter 93B of the Massachusetts General Laws makes unlawful any "unfair or deceptive acts or [business] practices" in the automobile industry, *see* Mass.Gen.Laws ch. 93B, § 3(a), including when a "manufacturer . . . engage[s] in any action which is arbitrary, in bad faith, or unconscionable and which causes damage to [a motor vehicle dealer] or to the public." *Id.* § 4(1). Under section 12A, "[a]ny franchisee or motor vehicle dealer who suffers any loss of money or property, real or personal, as a result of the use or employment by a manufacturer . . . [of] an unfair business practice or deceptive

---

1. Bertera voluntarily dismissed Count IV of its complaint which alleged a violation of Mass.Gen. Laws ch. 93A.

act ... may bring an action ... for damages and equitable relief." *Id.* § 12A.

In construing the application of Chapter 93B, the Court notes that it is well established that " 'state courts are the ultimate expositors of state law' and the federal courts are bound by the constructions placed upon state statutes by state courts absent extreme circumstances." *See Rundlett v. Oliver,* 607 F.2d 495, 500 (1st Cir.1979) (quoting *Mullaney v. Wilbur,* 421 U.S. 684, 691, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975)); *see also Woods v. Friction Materials, Inc.,* 30 F.3d 255, 263 (1st Cir.1994) (discussing federal court's interpretation of Massachusetts statute); *Wallace Motor Sales, Inc. v. American Motors Sales Corp.,* 780 F.2d 1049, 1063–65 (1st Cir. 1985) (interpreting Mass.Gen.Laws ch. 93B).

In its complaint, Bertera alleges that Chrysler's refusal of multiple requests to purchase the franchise assets of Springfield Chrysler constitutes "unfair acts [that] may have the effect of causing Bertera monetary damage." Specifically, in its supporting affidavit, Bertera asserts that Chrysler's approval of the sale to Balise means that the Bertera dealership will not be able "to take advantage of the additional sale points that an improved Springfield Chrysler will offer." Bertera further alleges in its supporting affidavit that "Balise's acquisition of Springfield Chrysler will result in damages to Bertera to the extent that Balise may greatly amplify its Chrysler and Plymouth Sales by virtue of its two sales locations within the Springfield market." In essence, Bertera alleges two different harms: (1) that Chrysler has denied Bertera a lucrative business opportunity and (2) that Chrysler has given its competitor an unfair advantage. Framed in the vocabulary of section 12A, Bertera alleges that it may suffer monetary loss because of the unfair business practices of its manufacturer/franchisor, and as a franchisee, it has brought an action for damages.

Under the plain meaning of chapter 93B, Bertera would have standing as a "franchisee or motor vehicle dealer", as defined by section 1, to bring an action against Chrysler, as the "manufacturer" and "distributor" with which Bertera has a contractual relationship, for arbitrary and bad faith practices. Chrys-

ler correctly asserts, however, that the harm alleged in Bertera's complaint does not fall within the ambit of chapter 93B's protection.

In *Beard Motors, Inc. v. Toyota Motor Distrib., Inc.,* 395 Mass. 428, 480 N.E.2d 303 (1985), the Massachusetts Supreme Judicial Court held that "a prospective purchaser of a motor vehicle dealership does not have standing under [Mass.Gen.Laws ch.] 93B, § 12A ... to bring an action against a motor vehicle distributor who unreasonably withholds consent to the transfer of the prospective seller's franchise." *Id.* at 428, 480 N.E.2d at 304. The Supreme Judicial Court explained that a franchised Chevrolet dealer, Beard, could not bring an action under section 4(3)(i), which provides that a manufacturer may not unreasonably withhold its consent to franchise transfers, after Toyota withheld approval of Beard's acquisition of a Toyota franchise and the assets of a dealership. *Id.* at 429–33, 480 N.E.2d at 304–07. The court noted that although Beard appeared to have standing under the broad terms of section 12A, "not every party who can claim an injury as a result of violations of a statute or regulation has standing to bring an action thereunder." *Id.* at 413, 480 N.E.2d at 305. As a result, whether the Chevrolet dealer had standing depended on the intent of the Massachusetts Legislature that drafted chapter 93B.

Considering the legislative history of chapter 93B, the *Beard Motors* court concluded that the injuries alleged by Beard as the prospective purchaser of an existing Toyota dealership—"primarily the loss of anticipated profits from the sale of Toyotas and from capital appreciation in the value of the Toyota dealership, due to its inability to obtain the Toyota franchise—are not injuries within the area of legislative concern that resulted in the enactment of" Mass.Gen.Laws ch. 93B. *Id.* at 433, 480 N.E.2d at 306.

In this case, Chrysler argues that under *Beard Motors,* a prospective purchaser of a motor vehicle dealership has no standing under section 12A to assert a claim against a manufacturer for withholding approval of a proposed purchase, "even if [the prospective purchaser] is an existing dealer." Accordingly, Chrysler asserts that Bertera has no

standing because it is a prospective purchaser suing a manufacturer for denying the acquisition of a dealership, despite Bertera's present contractual relationship as an existing Chrysler dealer. The Court disagrees with this broad interpretation of *Beard Motors.*

While the *Beard Motors* court may have denied standing to an existing Chevrolet dealer as a prospective purchaser of a Toyota dealership, in that case Toyota actually argued that "§ 12A only authorizes suits by motor vehicle dealers who have a contractual relationship with the distributor or manufacturer who commits an unfair act or practice." *Id.* at 431, 480 N.E.2d at 305. The Supreme Judicial Court ("SJC") did not expressly adopt Toyota's interpretation of section 12A, but it did hold for Toyota and denied standing to a motor vehicle dealer not affiliated with the manufacturer. Tellingly, the *Beard Motors* court concluded that "the intention of the Legislature was to protect motor vehicle franchisees and dealers from the type of injury to which they had been susceptible by virtue of the inequality of their bargaining power and that of their *affiliated* manufacturers and distributors." *Id.* at 433, 480 N.E.2d at 306 (emphasis added). If the SJC had explicitly adopted Toyota's interpretation of section 12A, Bertera would clearly have standing as a motor vehicle dealer alleging unfair acts by a manufacturer with which it has a contractual relationship.

Lacking such interpretative clarity, this Court notes that the present case is somewhat distinguishable from the situation in *Beard Motors,* even though Bertera is a dealer alleging the same kind of injuries that the Beard Chevrolet dealer had, i.e., loss of profits from the sale of automobiles at a dealership it could not acquire. The primary distinction lies in Bertera's status as a current franchisee to Chrysler. The Massachusetts Legislature designed chapter 93B to regulate the relations between franchisors and franchisees. *See Tober Foreign Motors, Inc. v. Reiter Oldsmobile, Inc.,* 376 Mass. 313, 320, 381 N.E.2d 908, 912 (1978). Moreover, Bertera's chapter 93B claim is brought under section 4(1), a provision couched in broader language than section 4(3)(i). In addition,

Aldo Bertera's affidavit identifies damages from Chrysler's allegedly arbitrary acts—increased competition from Balise—that the *Beard Motors* decision does not preclude. Finally, later Massachusetts decisions following *Beard Motors* only reiterate its holding; they do not extend its interpretation to cover the present facts. *See Bishay v. Foreign Motors, Inc.,* 416 Mass. 1, 10–11, 616 N.E.2d 96, 101–02 (1993); *Greater Lowell Auto Mall, Inc. v. Toyota Motor Distributors, Inc.,* 35 Mass.App.Ct. 247, 250, 618 N.E.2d 1369, 1371, *rev. denied,* 416 Mass. 1106, 622 N.E.2d 1364 (1993). As a result, the Court concludes that Chrysler is advocating a novel interpretation of state law.

The First Circuit, however, has instructed that when faced with a question of state law, a federal court "must exercise considerable caution when considering the adoption of a new application." *See Doyle v. Hasbro, Inc.,* 103 F.3d 186, 192 (1st Cir.1996). Proceeding with caution, the Court declines to travel down a new legal thoroughfare. While Bertera may stand merely as a prospective assignee in relation to Springfield Chrysler, under a commonsensical reading of the plain language of the statute, *see O'Connell v. Shalala,* 79 F.3d 170, 176 (1st Cir.1996), Bertera possesses legal standing as an affiliated dealer to sue the defendant manufacturer under chapter 93B, section 12A. Nonetheless, on the record before the Court, Chrysler is still entitled to summary judgment. No reasonable factfinder could conclude that Chrysler violated chapter 93B, section 4(1) by acting arbitrarily, in bad faith, or unconscionably.

Chapter 93B does not define what bad faith encompasses, but the First Circuit has noted that Massachusetts courts have interpreted the term broadly. *See General GMC, Inc. v. Volvo White Truck Corp.,* 918 F.2d 306, 309 (1st Cir.1990) (citing *Tober Foreign Motors, Inc. v. Reiter Oldsmobile, Inc.,* 376 Mass. 313, 381 N.E.2d 908 (1978)). One Massachusetts Superior Court Justice has stated that acting in good faith under chapter 93B "requires something more than commercial reasonableness, something on the order of subjective honesty in fact and purity of motive." *See Blackstone Subaru, Inc. v. Subaru of New Eng., Inc.,* No. 9101545, 1993

WL 818780, at *7 n. 20 (Mass.Super.Oct.22, 1993). The Massachusetts Uniform Commercial Code, meanwhile, offers: " 'Good faith' in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." Mass.Gen.Laws ch. 106, § 2–103(1)(b). The Restatement (Second) of Contracts explains the concept of good faith cogently: "Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified. But the obligation goes further: bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." See RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. d (1979); Scuncio Motors, Inc. v. Subaru of New Eng., Inc., 555 F.Supp. 1121, 1132 n. 16 (D.R.I.1982) (discussing good faith under Rhode Island version of chapter 93B), aff'd, 715 F.2d 10 (1st Cir.1983). Applying these well reasoned definitions to Chrysler's conduct, the Court finds that nothing remotely close to arbitrary or bad faith actions appears.

As precedent for its claim, Bertera cites only General GMC, Inc. v. Volvo White Truck Corp., 918 F.2d 306 (1st Cir.1990), in which the First Circuit reversed a grant of summary judgment to a manufacturer sued under section 4(1) by a truck dealer whose franchise was terminated. In that case, the truck dealer presented evidence raising an issue of material fact surrounding whether the manufacturer employed the "good cause" standard of Mass.Gen.Laws ch. 93B, § 4(3)(e) in terminating the dealer's franchise while maintaining a competitor in the same market area. General GMC, Inc., 918 F.2d at 309. Specifically, the dealer demonstrated that the manufacturer executives responsible for considering the termination had not even reviewed any of the dealer's financial statements before terminating it, raising the issue

of whether valid business reasons supported the decision. Id.

In this case, by contrast, Bertera's existing franchise has not been terminated. See id. at 309. Chrysler executives did not fail to review Bertera's financial information because Bertera never submitted a formal application to purchase the Springfield Chrysler dealership. Moreover, unlike the plaintiff in Beard Motors, Bertera has not entered into a purchase and sale agreement for the dealership for Chrysler's marketing review committee to approve. See Beard Motors, 395 Mass. at 429, 480 N.E.2d at 304.

Bertera merely expressed to a Chrysler official its interest in purchasing the assets of the downtown Springfield dealership and was informally rebuffed. There is no evidence that Katz acted in bad faith when he indicated that Chrysler's marketing guidelines would not allow one franchisee to own and operate two similar dealerships in the same market. See Blackstone Subaru, Inc. v. Subaru of New Eng., Inc., No. 9101545, 1993 WL 818780, at *7 (Mass.Super. Oct.22, 1993) (citing Mass.Gen.Laws ch. 93B, § 4(1)) ("The Franchisor's good faith in insisting on what it perceives to be an essential term of the franchise agreement is a critical consideration in determining whether it acted with good cause" in terminating dealership). Katz did not misrepresent the contents of the guidelines. He expressed the same opinion to both Bertera and Balise as to how Chrysler's marketing review committee would view a second dealership under the guidelines. In the Court's view, he was subjectively honest in his statements, and did not attempt to repel Bertera's interest in the deal in order to set up Balise's acquisition. For just as the guidelines are clear regarding the multiple dealer restriction, they are equally pellucid about Chrysler's discretion to depart from that restriction.

■ Nonetheless, Bertera claims that "Chrysler's acts had the practical effect of chilling Bertera's bid while simultaneously opening the door for Balise." Even assuming that Katz had the authority to bind Chrysler's marketing review committee in Michigan, however, Katz's statements merely

constituted an opinion on how the marketing guidelines applied to a proposed scenario. Katz's superior, Clark, expressed the same opinion, but Balise persuaded him to support an exception to the guidelines. No reasonable factfinder could rationally conclude that Bertera, as a sophisticated business entity, determined that its acquisition of Springfield Chrysler had been irreversibly denied by Katz's informal comments. Bertera's demonstrated unwillingness to rely on oral promises by Chrysler representatives in the past, as evidenced in its 1994 letter demanding formal written confirmation of a Chrysler official's verbal approval of the transfer of Bertera's ownership stock, belies such an interpretation. *See McCartin v. Westlake,* 36 Mass.App.Ct. 221, 232, 630 N.E.2d 283, 290 (1994) ("Business people understand that much of what is said during the negotiation of a business agreement never becomes part of the final bargain. Only what matters is reduced to writing and signed.").

The record reasonably supports that Bertera chose to sit on its hands rather than give vigorous chase to securing the object of its desire, as Balise has done, through the exception clause of the marketing guidelines. Unlike its competitor, Bertera did not try to drum up local support for a formal application to Chrysler's marketing review committee in Michigan, which it knew was the appropriate approval procedure. To justify its inaction, Bertera repeatedly emphasizes that its decision not to pursue the acquisition of Springfield Chrysler in earnest emanated from Katz's informal comments regarding the marketing guidelines. Yet, Bertera misses the mark by complaining that Chrysler's subsequent consideration of Balise's application "violate[s] the nondiscretionary language of the [g]uidelines relative to multiple ownership of like vehicle line-makes." *See Starr v. Fordham,* 420 Mass. 178, 190, 648 N.E.2d 1261, 1269 (1995) (stating that one party's obligations cannot "be delineated by isolating words and interpreting them as though they stood alone."). The guidelines contained a departure provision allowing Chrysler to make exceptions to the guidelines. After receiving the same opinion from Katz, Bertera chose not pursue an exception to the one dealership rule; Balise did. Both dealers had that option available. In light of Bertera's awareness of the exception provision, neither Clark's consideration and recommendation of a departure from the guidelines for Balise, nor Chrysler's ultimate approval of a departure, was arbitrary or bad faith.

Bertera has not identified—and the Court does not find—any Massachusetts precedent that raises even a hint of arbitrariness in Katz's statements and Clark's and Chrysler's subsequent actions.[2] Based on the guidelines and the departure provision, Chrysler and its representatives acted honestly and commercially reasonably with Bertera.

Contrary to Bertera's argument, there is no genuine issue of material fact on this point. Having waited until the eleventh hour to prevent its competitor from acquiring the dealership it desired, Bertera cannot maintain an action under chapter 93B, section 4(1) against Chrysler based on its local agent's informal remarks about advisory marketing guidelines containing a catchall exception. Accordingly, the Court grants summary judgment to Chrysler on Count I.

## B. Breach of Contract

 In Count II, Bertera alleges that Chrysler breached a contract created by the sales and service agreement and the guidelines amendment by refusing to consider Bertera's request to purchase the assets of Springfield Chrysler while approving Balise's identical request. As a result, Bertera speculates that it may suffer unspecified monetary damage at some point in the future. Where the rubber meets the road, however, Bertera's contract claim suffers a flat.

---

**2.** Any claim that Chrysler has created unfair competition from Balise could have been redressed in a claim under Mass.Gen.Laws ch. 93B, § 4(3)(1), which Bertera acknowledged at oral argument that it did not bring. *See, e.g., Tober Foreign Motors,* 376 Mass. at 320, 381 N.E.2d at 912 (describing how ch. 93B, § 4(3)(1) aimed at preventing manufacturers' unfair technique of granting new franchises near established ones); *Heritage Jeep–Eagle v. Chrysler Corp.,* 39 Mass.App.Ct. 254, 655 N.E.2d 140 (1995).

As a initial matter, the Court's construction of any contract between the parties will be governed by the choice-of-law provision in the dealership agreement that designated Michigan law. *See McCarthy v. Azure,* 22 F.3d 351, 356 n. 5 (1st Cir.1994) ("a reasonable choice-of-law provision in a contract generally should be respected"). As Chrysler has its principal place of business in Michigan, the Court honors this designation. *See Clair Int'l, Inc. v. Mercedes–Benz of N. Am., Inc.,* 124 F.3d 314, 320 (1st Cir.1997) (respecting parties, choice of New Jersey law in dealership agreement).

Reading the requirements in the amendment provision of the sales and service agreement, the Court finds that Chrysler's marketing guidelines memorandum, signed by a vice president and dated September 23, 1996, properly amended the principal contract between the parties. As a result, the Court will consider the sales and service agreement and the marketing guidelines as one integrated whole. *See Bed v. Fallon,* 307 Mich. 466, 471–72, 12 N.W.2d 396, 398 (1943) (quoting 12 Am.Jur. 782) ("when two instruments are entered into between the same parties concerning the same subject matter, whether made simultaneously or on different days, they may, under some circumstances, be regarded as one contract and interpreted together.").

Under the guidelines, however, Chrysler made no enforceable promises as to its conduct regarding dealership acquisition applications. Reading the unambiguous language of the guidelines memorandum as a whole, *see Stark v. Budwarker, Inc.,* 25 Mich.App. 305, 312 n. 4, 181 N.W.2d 298, 300 n. 4 (1970), Chrysler reserves complete discretion to approve or disapprove of dealership transfers applications on a deal-by-deal basis. *See Michaels v. Amway Corp.,* 206 Mich.App. 644, 649, 522 N.W.2d 703, 706 (1994) (noting, in case involving reservation-of-rights clause, that court may interpret contract when terms are clear and unambiguous). Despite the "in no event" language of the multiple dealership section, Chrysler does not bind itself to any criteria from which it cannot choose to depart in a given instance. *See Staebler–Kempf Oil, Co. v. Mac's Auto Mart,*

*Inc.,* 329 Mich. 351, 356, 45 N.W.2d 316, 318 (1951) ("The meaning of any particular part of an instrument can only be found by an examination of the whole."); *Carlson v. Johnson,* 275 Mich. 35, 37, 265 N.W. 517, 517 (1936) ("A promise which is made conditional on the will of the promisor is generally of no value, for one who promises to do a thing only if it pleases him to do it is not bound to perform it at all."); *Earl Dubey & Sons, Inc. v. Macomb Concrete Corp.,* 81 Mich.App. 662, 677, 266 N.W.2d 152, 159 (1978) (promise unenforceable when performance dependent on discretion of promisor); RESTATEMENT (SECOND) OF CONTRACTS § 77 cmt. a (1981) ("Words of promise which by their terms make performance entirely optional with the 'promisor' do not constitute a promise."). If there were no promises in the guidelines, no amendment of the dealership agreement could have occurred and, as a result, no breach of contract action may sound.

Assuming *arguendo* that a written instrument making no promises could properly amend the principal contract, Bertera's breach of contract claim still fails. Bertera refuses to look beyond the verbiage and acknowledge that Chrysler expressly reserves "the right to depart" from the two dealership provision, or any provision, when it determines that a departure will serve its interests. Simply put, no reasonable factfinder could find that Chrysler made a binding promise to Bertera that it would never allow two dealerships in the same market while Bertera was aware of this reservation-of-rights clause that rendered any promise illusory. *See Carlson,* 275 Mich. at 37, 265 N.W. at 517; *Mastaw v. Naiukow,* 105 Mich.App. 25, 29, 306 N.W.2d 378, 380 (1981) ("The fundamental element of promise seems to be an expression of intention by the promisor that his future conduct shall be in accordance with his present expression, irrespective of what his will may be when the time of performance arrives."). Chrysler made no affirmative promises and, accordingly, broke none.

Considering that Chrysler has presented evidence, in the form of a letter from Bertera's counsel, that Bertera has been unwilling to conduct its business dealings with Chrysler's local representatives through oral

understandings and has insisted on receiving "formal approval from Chrysler Corporation," the Court will not indulge Bertera the unreasonable inference that it believed Katz's statements to constitute promises binding on Chrysler's marketing review committee in Michigan. *See Smith,* 76 F.3d at 428. No reasonable factfinder could find that Chrysler breached a contract with Bertera by departing from the guidelines provision and approving Balise's formal dealership transfer application. As a result, Chrysler is entitled to judgment as a matter of law.

Moreover, Bertera never submitted a formal application to approve the acquisition of Springfield Chrysler, thereby becoming an "Applicant" with standing to invoke the guidelines. Accordingly, its argument based on alleged promises in the guidelines is premature. Further, the damage Bertera alleges involves increased competition by Balise. Even assuming that Chrysler broke a promise made to Bertera, under Michigan law "[a] party to a contract is ordinarily entitled to the benefit of the bargain he has made." *See Davidson v. General Motors Corp.,* 119 Mich. App. 730, 733, 326 N.W.2d 625, 626 (1982) (footnote omitted). "The proper measure of damages for breach of contract is, therefore, the pecuniary value of the benefits the aggrieved party would have received if the contract had not been breached." *Id.* Had Chrysler not approved the transfer to Balise, Bertera would still be faced with competing dealerships surrounding it on both sides. *See People v. Victor,* 287 Mich. 506, 517, 283 N.W. 666, 671 (1939) (noting that "any form of competition tends to take trade away from other dealers with a natural injury to their businesses.... Surely there cannot be anything unlawful about competition if no unfair practices are followed."). The conclusory speculation of future damages by Bertera lends support to Chrysler's argument that it did not breach a contractual promise. *See Medina–Munoz,* 896 F.2d at 8.

As there are no genuine issues of material fact and Chrysler is entitled to judgment as a matter of law on the breach of contract claim, the Court grants summary judgment in Chrysler's favor on Count II.

### C. Breach of the Covenant of Fair Dealing

Bertera next argues that Chrysler breached its implied duty of good faith and fair dealing by approving Balise's dealership transfer application. Under the Michigan common law governing the dealer agreement, however, the implied covenant of good faith and fair dealing does not attach when bargaining parties have "unmistakably expressed" their rights under the contract. *See General Aviation, Inc. v. Cessna Aircraft Co.,* 915 F.2d 1038, 1041 (6th Cir.1990) (under Michigan law, obligation of good faith does not override express contract terms); *Hubbard Chevrolet Co. v. General Motors Corp.,* 873 F.2d 873, 877 (5th Cir.) (interpreting Michigan law to hold that covenant of good faith does not apply when dealer agreement gives franchisor "authority to approve or disapprove relocation [of dealership] for its own reasons"), *cert. denied,* 493 U.S. 978, 110 S.Ct. 506, 107 L.Ed.2d 508 (1989); *Bushwick–Decatur Motors v. Ford Motor Co.,* 116 F.2d 675, 676–77 (2d Cir.1940) (applying Michigan law not to imply good faith covenant when contract gives franchisor unlimited discretion to terminate dealership). As a result, a court cannot imply a covenant of good faith and fair dealing to override or replace express contractual provisions when the express terms of a contract govern the disputed issue. *See Cook v. Little Caesar Enter., Inc.,* 972 F.Supp. 400, 409 (E.D.Mich. 1997); *Van Arnem Co. v. Manufacturers Hanover Leasing Corp.,* 776 F.Supp. 1220, 1223 (E.D.Mich.1991).

Applying this principle to the guidelines that allegedly amend the dealer agreement in this case, the Court concludes that Chrysler has expressly reserved unfettered discretion to depart from the marketing guidelines that makes it decision to depart in Balise's case unassailable. The departure provision precludes any application of an implied covenant of good faith to Chrysler's actions. Accordingly, Chrysler is entitled to judgment as a matter of law and the Court grants it summary judgment on Count III.

### D. Fraud

In Count V, Bertera argues that Chrysler committed actionable fraud. This claim fares no better than Bertera's prior

claims. Under Massachusetts law, a plaintiff's reliance upon misrepresentations to his detriment may give rise to a claim of fraud, but only if such reliance is reasonable. *See Saxon Theatre Corp. v. Sage,* 347 Mass. 662, 666–67, 200 N.E.2d 241, 244–45 (1964); *see also Kennedy v. Josephthal & Co., Inc.,* 814 F.2d 798, 805 (1st Cir.1987); *Elias Bros. Restaurants v. Acorn Enter., Inc.,* 831 F.Supp. 920, 922 (D.Mass.1993); *Yerid v. Mason,* 341 Mass. 527, 530, 170 N.E.2d 718, 720 (1960) (stating that "false statements of belief, of conditions to exist in the future, or of matters promissory in nature are not actionable").

Assuming for argument's sake that Katz had apparent authority to bind Chrysler to a decision as if he was the marketing review committee denying a formal application by Bertera—an assumption that the affidavits tend to belie—no factfinder rationally could conclude that Bertera's professed reliance on Katz's statements was reasonable. Even on Bertera's version of the conversations, Katz's statements amount to no more than the local dealer placement manager's opinion of how the national marketing decisionmaker in Michigan would consider his potential application under the guidelines. Only willful blindness of the guidelines' departure provision could have led Bertera to believe that its desire to acquire Springfield Chrysler had been permanently stymied by these comments—and willful blindness is insufficient to support a cognizable claim of reasonable reliance. Accordingly, the Court rejects the unreasonable inference upon which Bertera's fraud claim rests. *See Smith,* 76 F.3d at 428. The Court grants summary judgment to Chrysler on Count V.

## IV. CONCLUSION

The Court need go no further. Finding that there are no genuine issues of material fact and that Chrysler is entitled to judgment as a matter of law, the Court grants Chrysler's motion for summary judgment on all counts.

It is So Ordered.